## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| GREGORY W. BARAN, M.D., | ) | Civil Action No.: 1:04CV1251 |
| | ) | |
| Plaintiff, | ) | Judge Kathleen M. O'Malley |
| | ) | |
| vs. | ) | Mag. Judge William H. Baughman |
| | ) | |
| AMT SVERIGE AB and MEDICAL DEVICE | ) | |
| TECHNOLOGIES, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

---

### PLAINTIFF GREGORY W. BARAN, M.D.'S BRIEF
### REGARDING DISPUTED CLAIM CONSTRUCTION ISSUES

---

**TABLE OF CONTENTS**

I.  **INTRODUCTION**................................................................................................1

II.  **THE PATENTS-IN-SUIT** ...............................................................................2

 A. **The '797 Patent**...........................................................................................2

 B. **The '798 Patent** ..........................................................................................7

III. **APPLICABLE LEGAL STANDARDS FOR CONSTRUING CLAIMS**...................7

IV. **BASES FOR DR. BARAN'S CLAIM CONSTRUCTION** .........................................13

 A. **Disputed Limitations in Claim 7 of the '797 Patent**...................................14

  1. "a cannula mount affixing the cannula to the guide"...................................14

  2. "a manually operable charging member for moving the guide to the charged position against the urging of the coil spring"................................15

  3. "a release means for retaining the guide in the charged position"................18

 B. **Disputed Limitations in Claim 2 of the '798 Patent**...................................21

  1. "biopsy actuator".......................................................................................21

  2. "said proximal end having a first connector means secured thereto" ..........23

  3. "said biopsy actuator comprising a second connector means for releasably and fixedly engaging the first connector means" ........................24

  4. "said stylet means being detachable from said cannula"..............................29

V.  **CONCLUSION**................................................................................................32

# TABLE OF AUTHORITIES

**Cases**

Allen Engineering Corp. v. Bartell Industries,
299 F.3d 1336 (Fed. Cir. 2002) ................................................................ 24, 28

Athletic Alternatives, Inc. v. Prince Mfg., Inc.,
73 F.3d 1573 (Fed. Cir. 1996) ............................................................. 9, 10, 23

Bell Atlantic Network Serv., Inc. v. Covad Comm. Group, Inc.,
262 F.3d 1258 (Fed. Cir. 2001) ................................................................ 20, 24

C.R. Bard, Inc. v. U.S. Surgical Corp.,
388 F.3d 858 (Fed. Cir. 2004) ..................................................................... 11

CCS Fitness Inc. v. Brunswick Corporation,
288 F.3d 1359 (Fed. Cir. 2002) ................................................................. 9, 17

Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus.,
145 F.3d 1303 (Fed. Cir. 1998) ..................................................................... 12

Clearstream Wastewater Sys. v. Hydro-Action, Inc.,
206 F.3d 1440 (Fed. Cir. 2000) ..................................................................... 12

Cole v. Kimberly-Clark Corp.,
102 F.3d 524 (Fed. Cir. 1996) ............................................................. 12, 25, 28

Creo Products, Inc. v. Presstek, Inc.,
305 F.3d 1337 (Fed. Cir. 2002) ..................................................................... 20

Envirco Corp. v. Celestra Cleanroom, Inc.,
209 F.3d 1360 (Fed. Cir. 2000) ..................................................................... 28

Ferguson Beauregard/Logic Controls v. Mega Sys., LLC,
350 F.3d 1327 (Fed. Cir. 2003) ...................................................................... 8

Gemstar-TV Guide International, Inc. v. International Trade Commission,
383 F.3d 1352 (Fed. Cir. 2004) ..................................................................... 10

Generation II Orthotics, Inc. v. Med. Tech., Inc.,
263 F.3d 1356 (Fed. Cir. 2001) ..................................................................... 19

Greenberg v. Ethicon Endo-Surgery, Inc.,
91 F.3d 1580 (Fed. Cir. 1996) .................................................................. 12, 25

Home Diagnostics, Inc. v. LifeScan, Inc.,
381 F.3d 1352 (Fed. Cir. 2004) ........................................................................8

IMS Tech., Inc. v. Haas Automation, Inc.,
206 F.3d 1422 (Fed. Cir. 2000). ..........................................................11, 12, 18, 19

Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.,
381 F.3d 1111 (Fed. Cir. 2004) ...................................................................7, 8

Inverness Med. Switz. GmbH v. Warner Lambert Co.,
309 F.3d 1373 (Fed. Cir. 2002) .................................................................. 10, 22

Johnson Worldwide Assoc., Inc. v. Zebco Corp.,
175 F.3d 985 (Fed. Cir. 1999) ......................................................................... 17

Legett & Platt, Inc. v. Hickory Springs Mfg. Co.,
285 F.3d 1357 (Fed. Cir 2002) ................................................................... 20, 24

Markman v. Westview Instr., Inc.,
52 F.3d 967 (Fed. Cir. 1995), aff'd, 517 U.S. 370 (1996) ................................. 7, 9, 10

Merck & Co. v. Teva Pharms. USA, Inc.,
347 F.3d 1367 (Fed. Cir. 2003). ....................................................................9

Micro Chem. Inc. v. Great Plains Chem. Co., Inc.,
194 F.3d 1250 (Fed. Cir. 1999). ............................................................. 13, 18, 20

Nazomi Comm., Inc. v. ARM Holdings, PLC,
403 F.3d 1364 (Fed. Cir. 2005) ...................................................................... 10

North American Vaccine, Inc. v. American Cyanamid Co.,
7 F.3d 1571 (Fed. Cir. 1993) ........................................................................9

PC Connector Solutions LLC v. SmartDisk Corp.,
406 F.3d 1359 (Fed. Cir. 2005) .......................................................................8

Phillips v. AWH Corp.,
2005 WL 1620331 (Fed. Cir. 2005) ................................................8, 9, 10, 15, 31

Pitney Bowes, Inc. v. Hewlett-Packard Co.,
182 F.3d 1298 (Fed. Cir. 1999) ..................................................................... 11

Rodime PLC v. Seagate Tech., Inc.,
174 F.3d 1294 (Fed. Cir. 1999) ................................................................ 12, 13, 23

Sage Products, Inc. v. Devon Industries, Inc.,
126 F.3d 1420 (Fed. Cir. 1997) ........................................................................... 12, 25

Toro Co. v. White Consolidated Indus., Inc.,
199 F.3d 1295 (Fed. Cir. 1999) ................................................................................... 7

Transmatic Inc. v. Gulton Indus.,
53 F.3d 1270 (Fed. Cir. 1995) ................................................................................... 13

Vitronics Com v. Conceptronic, Inc.,
90 F.3d 1576 (Fed. Cir. 1996) ....................................................................... 7, 10, 11

Watts v. XL Sys., Inc.,
232 F.3d 877 (Fed. Cir. 2000) ............................................................................ 12, 25

York Products, Inc. v. Central Tractor Farm & Family Center,
99 F.3d 1568 (Fed. Cir. 1996). ................................................................................. 12

**Statutes**

35 U.S.C. § 112 ........................................................................................................... 7
35 U.S.C. § 112, ¶ 6 .......................................................................................... 11, 23

**Other Authorities**

http://www.usb.org .................................................................................................. 26

Pursuant to the Court's Case Management Order of February 11, 2005, plaintiff Gregory W. Baran, M.D. submits the following brief regarding disputed claim construction issues concerning U.S. Patent No. 5,025,797 and U.S. Patent No. 5,400,798.

## I.    INTRODUCTION

This is a patent infringement suit involving U.S. Patent No. 5,025,797 ("the '797 patent") and U.S. Patent No. 5,400,798 ("the '798 patent") (collectively referred to as "the patents-in-suit") issued to and owned by plaintiff Gregory W. Baran, M.D. ("Dr. Baran").  A copy of the '797 patent and the '798 patent are attached hereto as Exhibits A and B, respectively.  The patents-in-suit relate to automatic biopsy instruments.

In his Complaint filed on July 2, 2004, Dr. Baran alleged that defendants AMT Sverige AB ("AMT") and Medical Device Technologies, Inc. ("MDTech") infringed the patents-in-suit by making, using, offering for sale, selling, distributing, and/or importing into the United States the BioPince biopsy instrument.  In his Amended Complaint filed on May 5, 2005, Dr. Baran clarified his allegations against the defendants and included additional claims of infringement against AMT concerning the Express biopsy instrument.

On April 5, 2005, pursuant to the Court's February 11, 2005 Order, plaintiff Dr. Baran and defendant MDTech submitted a Joint Claim Construction Chart for Asserted Claims in U.S. Patent No. 5,025,797 and U.S. Patent No. 5,400,798.

This brief is submitted to explain and support Dr. Baran's proposed construction of the disputed terms of the asserted claims.  By agreement of the parties, this submission addresses those disputed claim terms that have at least some bearing on the issue of infringement.

## II.     THE PATENTS-IN-SUIT

### A.     The '797 Patent

The '797 patent was filed on March 29, 1989 and issued on June 25, 1991.  The '797 patent is directed to multiple embodiments of an automated biopsy instrument.

Fig. 1, shown below, illustrates an exploded view of one embodiment of an automated biopsy instrument 10 described in the '797 patent.



FIG. 1

As shown in Fig. 1, the automated instrument 10 includes several main components, which will be discussed in more detail below: a casing 12; a support rod 14; a coil spring 16; a guide 18; a charging member 20; a lever 22; and a needle 24.  (Exh. A, col. 4, l. 47-51.)

2

The casing 12 includes an elongated hollow cylindrical tube 26 having a rear end 28 and a forward end 32.  (Id., col. 4, l. 52-56.)  Secured to an inside surface of the rear end 28 of the tube 26 is a base 44.  (Id., col. 5, l. 21-23.)  Extending from the base 44 towards the forward end 32 of the tube 26 is the support rod 14, which includes an elongated cylindrical shaft 42.  (Id., col. 5, l. 25-27.)  An anchor socket or clevis 46 is formed in the distal end of the shaft 42.

The guide 18 includes a forward cylinder 48 and a rear cylinder 50 joined coaxially therewith.  (Id., col. 5, l. 25-27.)  The outside diameter of the forward cylinder 48 is smaller than that of the rear cylinder 50, thereby providing an annular external shoulder 54.  (Id., col. 5, l. 27-31.)  The exterior surface of the distal end of the forward cylinder 48 includes a male thread 56.  (Id., col. 5, l. 34-36.)

The spring 16 is coaxially received over the shaft 42 of the support rod 14 and disposed between the guide 18 and the base 44 from which the shaft 42 extends.  (Id., col. 6, l. 33-37.)  The spring 16 is configured to urge the guide 18 to the discharged position, which will be discussed in more detail below.  (Id., col. 3, l. 43-44.)

The needle 24 includes a cannula 66 secured to a cannula mount 58 and a stylet 60 slidably received within the cannula 66.  (Id., col. 5, l. 37-40.) The cannula mount 58 includes a cylindrical collar 62 having an inner surface 72 formed with a female thread 74 adapted to mate with the male thread 56 of the guide 18.  (Id., col. 5, l. 44-46.)  The cannula 66 includes a hollow tube that is sharpened about its circumference at its distal end 76.  (Id., col. 5, l. 52-54.)  The stylet 60 is sharpened to a point at its distal end 78 and is formed with an anchor 80 at its proximal end 82, with the anchor 80 adapted to mate with the clevis 46 of the shaft 42.  (Id., col. 6, l. 3-5.)  The stylet 60 remains stationary during operation of the biopsy instrument 10.  (Id., col. 7, l. 20-23.)

3

The charging member 20 includes a bell-shaped hollow structure that surrounds the tube 26.  (Id., col. 6, l. 10-12.)  Formed on an interior surface 92 of the forward section 86 of the charging member 20 are a pair of oppositely disposed guide pins 94.  (Id., col. 6, l. 20-24.)

The lever 22 includes a finger rest portion 96 and a mounting section 98 that is flexibly secured to the casing 12.  (Id., col. 6, l. 25-27.)  The mounting section 98 of the lever 22 includes a latching projection 102 configured to engage the external shoulder 54 of the guide 18 to retain it in the charged position, which will be discussed in more detail below.  (Id., col. 6, l. 29-32.)

The cannula 66 is movable via guide 18 between the charged position and the discharged position.  (Id., col. 18, l. 9-13.)  In the charged position, shown in Fig. 3, the cannula 66 is retracted to expose the distal end 78 of the stylet 60.  In the discharged position, as shown in Fig. 4, the distal end 76 of the cannula 66 is displaced from the charged position in a forward direction beyond the distal end 78 of the stylet 60.  (Id., col. 8, l. 1-13.)

To move the cannula 66 to the charged position to prepare the biopsy instrument 10 to take a biopsy, the charging member 20 is retracted towards the rear end 28 of the tube 26.  (Id., col. 7, l. 4-7.)  This action causes the guide pins 94 to retract the guide 18 towards the base 44, thereby compressing the spring 16.  (Id., col. 7, l. 12-16.)  The charging member 20 is retracted until the latching projection 102 of the lever 22 engages the external shoulder 54 of the guide 16.  (Id., col. 7, l. 23-27.)  Once the latching projection 102 of the lever 22 engages the external shoulder 54 of the guide 16, the biopsy instrument 10 is in the charged position and ready to take a biopsy.  (Id., col. 7, l. 23-28; see also Fig. 3.)

To take a biopsy, the location of the tissue to be sampled is identified by the clinician and the exposed distal end 78 of the stylet 60 is positioned approximate this location while the biopsy instrument 10 is in the charged position.  (Id., col. 7, l. 55-61.)  To release the cannula 66 to the

discharged position to take the biopsy, the finger rest portion 96 of the lever 22 is depressed, thereby raising the latching projection 102.  (Id., col. 7, l. 61-66.)  By raising the latching projection 102 of the lever 22, it disengages from the external shoulder 54 of the guide 16.  (Id., col. 7, l. 66-68.)  The stored energy of the compressed spring 16 is released to drive the cannula 66 forward over the stationary stylet 60 and into the tissue.  (Id., col. 8, l. 1-4.)  The movement of the cannula 66 causes its sharpened distal end 76 to cut and isolate a sample core of tissue and retain it within the cannula 66.  (Id., col. 8, l. 14-17.)  The cannula 66 is in the discharged position. (See Fig. 4.)  The tissue sample can be extracted by retracting the cannula 66 to the charged position, thereby expelling the tissue sample.  (Id., col. 8, l. 21-24.)

This embodiment (hereinafter referred to as "the Fig. 1 embodiment")  is considered to be a reusable instrument because it may interchangeably employ various types of needles to perform various types of biopsies.  (Id., col. 8, l. 61-65.)  Access to replace the needles is provided by access ports 36a, 36b provided in the tube 26.  (Id., col. 7, l. 31-40.)

Fig. 5, shown below, illustrates another embodiment of an automated biopsy instrument 210 described in the '797 patent.  The automated biopsy instrument 210 is similar in structure and operation to the automated biopsy instrument 10 of the Fig. 1 embodiment, with one exception being that the cannula mount and the stylet mounting differ.



FIG. 5

As shown in Fig. 5, the cannula mount 258 of the biopsy instrument 210 includes a cylindrical base 262, head 264, and midsection 265, which has a larger diameter than the base 262 and head 264.  (Id., col. 9, l. 26-28.)  The head 264 has a bore at one end configured to receive the cannula 266 and secure it thereto.  (Id., col. 9, l. 28-31.)  The base 262 is configured to be inserted into a bore 255a in the guide 218 to secure it thereto.  (Id., col. 9, l. 41-43.) Regarding the stylet mounting, the proximal end 282 of the stylet 260 of the biopsy instrument 210 is secured to a recess 246 in the shaft 242.  (Id., col. 9, l. 40-41.)

This embodiment (hereinafter referred to as "the Fig. 5 embodiment") is considered to be a disposable biopsy instrument because the cannula 258 and the stylet 260 are not designed to be

replaceable.  (Id., col. 8, l. 57-60.)  However, these components are designed as separate components capable of being separated from each other during assembly/disassembly.

### B.    The '798 Patent

The '798 patent was filed on April 23, 1993 and issued on March 28, 1995.  The '798 patent is related to the '797 patent. (See Exh. B, Related U.S. Application Data on front page.) The '798 patent includes the same Fig. 1 and Fig. 5 embodiments as the '797 patent.  Although the '798 patent includes several additional embodiments, these additional embodiments will not be discussed as they are not germane to the issues addressed in this brief.

### III.    APPLICABLE LEGAL STANDARDS FOR CONSTRUING CLAIMS

A patent is comprised of two basic parts: (1) a written description of the invention, called the "specification," which enables one of ordinary skill in the art to which it pertains to practice the invention, and (2) "claims" that define the scope of legal protection.  35 U.S.C. § 112.  It is the claims of a patent, rather than the specification, which "define the invention to which the patentee is entitled the right to exclude."  See Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc., 381 F.3d 1111, 1115 (Fed. Cir. 2004); see also Vitronics Com v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("we look to the words of the claims themselves . . . to define the scope of the patented invention"); Markman v. Westview Instr., Inc., 52 F.3d 967, 980 (Fed. Cir. 1995), aff'd, 517 U.S. 370 (1996) ("The written description part of the specification itself does not delimit the right to exclude. That is the function and purpose of claims.").

The construction of a claim of a utility patent is a matter of law exclusively for the Court to determine.  Markman, 52 F.3d at 970-71.  In ascertaining the proper claim construction, a claim term is to be given its ordinary and customary meaning.  Vitronics, 90 F.3d at 1582; Toro Co. v. White Consolidated Indus., Inc., 199 F.3d 1295, 1299 (Fed. Cir. 1999).  The ordinary and

customary meaning of a claim term is determined from the perspective of a hypothetical person of ordinary skill in the relevant art to which the invention pertains at the time of the invention. See Innova, 381 F.3d at 1116 ("A court construing a patent claim seeks to accord a claim the meaning it would have to a person of ordinary skill in the art at the time of the invention."); Home Diagnostics, Inc. v. LifeScan, Inc., 381 F.3d 1352, 1358 (Fed. Cir. 2004) ("customary meaning" refers to the "customary meaning in [the] art field"); Ferguson Beauregard/Logic Controls v. Mega Sys., LLC, 350 F.3d 1327, 1338 (Fed. Cir. 2003) (claim terms "are examined through the viewing glass of a person skilled in the art"); see also PC Connector Solutions LLC v. SmartDisk Corp., 406 F.3d 1359, 1363 (Fed. Cir. 2005) (meaning of claim "must be interpreted as of [the] effective filing date" of the patent application).

In Phillips v. AWH Corp., 2005 WL 1620331, at *4 (Fed. Cir. July 12, 2005), the U.S. Court of Appeals for the Federal Circuit restated the basic principles of claim construction and clarified the role of extrinsic evidence, namely dictionaries, in claim construction.  The Federal Circuit refused to provide a rigid algorithm for claim construction, but emphasized that courts must assign an appropriate weight to sources used to discern the "ordinary and customary meaning" of terms.  Id. at *11.  According to the Phillips opinion, the greatest weight should be placed on intrinsic evidence, which includes the claims, specification, and prosecution history of the patent.  Id. at *10.

In discussing the appropriate weights to be given to the different sources of intrinsic evidence, the Phillips court stated that "apart from the specification and the prosecution history, the claims themselves provide substantial guidance as to the meaning of particular claim terms." Id. at *6.  Indeed, the Federal Circuit had previously held that the first and most important evidence a court looks at to construe a claim term is the claim language itself.  North American

Vaccine, Inc. v. American Cyanamid Co., 7 F.3d 1571, 1575 (Fed. Cir. 1993); Athletic Alternatives, Inc. v. Prince Mfg., Inc., 73 F.3d 1573, 1578 (Fed. Cir. 1996)

In determining the ordinary and customary meaning of a term, "the context in which a term is used in an asserted claim can be highly instructive."  Phillips, 2005 WL 1620331, at *6. Other claims in the patent, both asserted and unasserted, can be valuable sources of enlightenment as to the meaning of a claim term by identifying differences between claims.  For example, under the doctrine of claim differentiation, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the claim from which it depends.  Id. at *7.

The claims, however, are not the sole source for construing terms in a patent.  Courts must also look to the specification for guidance in determining the ordinary and customary meaning of a claim term.  Since the claims are part of the specification, they must be read in view of the specification.  Markman, 52 F.3d at 979.  In other words, "claims must be construed so as to be consistent with the specification."  Merck & Co. v. Teva Pharms. USA, Inc., 347 F.3d 1367, 1371 (Fed. Cir. 2003).

In cases where a patentee used a claim term differently than its ordinary and customary meaning and expressly defined the meaning for such different usage in the written specification, the specification is determinative in deciding the meaning of such claim term.  In these cases where the inventor is his/her own lexicographer, the patentee's definition in the specification controls over the ordinary and customary meaning.  See CCS Fitness, Inc. v. Brunswick Corp., 288 F.3d 1359, 1366 (Fed. Cir. 2002).

Although claims must be construed in view of the specification, a court must avoid the importing limitations from the specification into the claims.  For example, even though the

9

specification describes exemplary embodiments of the invention, the claims must not be confined to those specific embodiments.  See Phillips, 2005 WL 1620331, at *15; see also Nazomi Comm., Inc. v. ARM Holdings, PLC, 403 F.3d 1364, 1369 (Fed. Cir. 2005) (claims may embrace "different subject matter than is illustrated in the specific embodiments in the specification").  Indeed, even if a patent describes only one embodiment of the invention, "the claims of the patent must not be construed as being limited to that embodiment."  See Phillips, 2005 WL 1620331, at *15 (citing Gemstar-TV Guide Int'l., Inc. v. Int'l. Trade Comm., 383 F.3d 1352, 1366 (Fed. Cir. 2004)).

In addition to the claim language and the specification, a court may also consider the prosecution history, if it is in evidence, to assist in claim construction.  Vitronics, 90 F.3d at 1582-83; Markman, 52 F.3d at 979-81.  However, as the Phillips court observed, because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes.  See Phillips, 2005 WL 1620331, at *9; see also Inverness Med. Switz. GmbH v. Warner Lambert Co., 309 F.3d 1373, 1380-82 (Fed. Cir. 2002) (the ambiguity of the prosecution history made it less relevant to claim construction); Athletic Alternatives, 73 F.3d at 1580 (the ambiguity of the prosecution history made it "unhelpful as an interpretive resource" for claim construction).

The claim language, the specification and the prosecution history of the patent, all of which is referred to as "intrinsic evidence," may be considered by a court in construing the claims.  Vitronics, 90 F.3d at 1582-83; Markman, 52 F.3d at 979-81.  In addition, "extrinsic evidence," such as dictionaries, encyclopedias, treatises, and expert and inventor testimony, may be relevant to claim construction.  See Phillips, 2005 WL 1620331, at *10 (citing Vitronics, 90

F.3d at 1583).  However, extrinsic evidence is considered less reliable than intrinsic evidence in determining the legally operative meaning of claim language for the following reasons: (i) it is not part of the patent record; (ii) it may not be written for or by persons skilled in the art (e.g., general purpose dictionaries); and (iii) it typically suffers from bias (e.g., experts).  Id. (citing C.R. Bard, Inc. v. U.S. Surgical Corp., 388 F.3d 858, 862 (Fed. Cir. 2004)).  For these reasons, extrinsic evidence cannot be relied upon in interpreting claims if it contradicts the meaning of the claims discernable from the intrinsic evidence.  Pitney Bowes, Inc. v. Hewlett-Packard Co., 182 F.3d 1298, 1308 (Fed. Cir. 1999).

Aside from judicially-created rules of claim construction, the patent statute provides a rule of claim construction for so-called "means-plus-function" claiming.  Under 35 U.S.C. § 112, ¶ 6, an element of a claim, such as a mechanical component, may be claimed as a "means" for performing a specified function without the recital of structure in support thereof.  35 U.S.C. § 112, ¶6 reads as follows:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

35 U.S.C. § 112, ¶6.  "Limitations contemplated by § 112, ¶ 6, often referred to as means-plus-function or step-plus-function limitations, recite a specific function to be performed rather than the structure, material, or acts for performing that function.  Such limitations are "construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof."  IMS Tech., Inc. v. Haas Automation, Inc., 206 F.3d 1422, 1429-30 (Fed. Cir. 2000).

Under Federal Circuit case law, the use of the word "means" in a claim "triggers a presumption that the inventor used this term advisedly to invoke the statutory mandate for means-plus-function clauses."  York Products, Inc. v. Central Tractor Farm & Family Center, 99

11

F.3d 1568, 1574 (Fed. Cir. 1996).   This presumption, however, may be overcome in two ways. First, "a claim element that uses the word 'means' but recites no function corresponding to the means does not invoke § 112, ¶ 6." Rodime PLC v. Seagate Tech., Inc., 174 F.3d 1294, 1302 (Fed. Cir. 1999).   Second, "even if the claim element specifies a function, if it also recites sufficient structure or material for performing that function, § 112, ¶ 6 does not apply." Id.; see also Cole v. Kimberly-Clark Corp., 102 F.3d 524, 531 (Fed. Cir. 1996) ("To invoke [§ 112, paragraph 6], the alleged means-plus-function claim element must not recite a definite structure which performs the described function.").

Therefore, the mere use of the word "means" after a limitation, without more, does not suffice to make that limitation a means-plus-function limitation.   Cole, 102 F.3d at 531. Moreover, a claim term recites sufficient structure if "the 'term, as the name for structure, has a reasonably well understood meaning in the art.'" Watts v. XL Sys., Inc., 232 F.3d 877, 880-81 (Fed. Cir. 2000) (quoting Greenberg v. Ethicon Endo-Surgery, Inc., 91 F.3d 1580, 1583 (Fed. Cir. 1996)); see also Sage Products, Inc. v. Devon Industries, Inc., 126 F.3d 1420, 1427-28 (Fed. Cir. 1997) ("[W]here a claim recites a function, but then goes on to elaborate sufficient structure, material or acts within the claim itself to perform entirely the recited function, the claim is not in means-plus-function format.").

"Claim construction of a § 112, ¶ 6, limitation includes identifying the claimed function and determining the corresponding structure or act disclosed in the specification, both of which are questions of law. …" IMS Tech. 206 F.3d at 1430; see also Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., 145 F.3d 1303, 1308 (Fed. Cir. 1998); Clearstream Wastewater Sys. v. Hydro-Action, Inc., 206 F.3d 1440 (Fed. Cir. 2000).   The statute, however, does not permit incorporation of structure from the written description beyond that necessary to perform the

12

claimed function.  Micro Chem. Inc. v. Great Plains Chem. Co., Inc., 194 F.3d 1250, 1257-1258 (Fed. Cir. 1999).

In addition, "[a] claim need not claim every function of a working device."  Rodime PLC, 174 F.3d at 1303 .  "Rather, a claim may specify improvements in one function without claiming the entire machine with its many functions."  Id.  For that reason, it is error to import unnecessary functional limitations into the claim.  Transmatic Inc. v. Gulton Indus., 53 F.3d 1270 (Fed. Cir. 1995); see also Micro Chem., 194 F.3d at 1257-58.  (A requirement in a patent's apparatus claims of a "weighing means" is a § 112, ¶ 6 means clause.  The recited function is simply "weighing" and not as the District Court held, the "sequential cumulative weighing" illustrated in the patent's preferred embodiment.)

## IV.    BASES FOR DR. BARAN'S CLAIM CONSTRUCTION

Plaintiff Dr. Baran and defendant MDTech submitted a Joint Claim Construction Chart for asserted claims in the U.S. Patent No. 5,025,797 and U.S. Patent No. 5,400,798 on April 5, 2005, setting forth the parties' respective proposed construction of the asserted claims of the patents-in-suit.  A copy of the Joint Claim Construction Chart for Asserted Claims in U.S. Patent No. 5,025,797 and U.S. Patent No. 5,400,798 is attached as Exhibit C.  As shown in that document, the parties disagreed on the construction of nearly all of the claim limitations of the asserted claims of the patents-in-suit.

In an effort to narrow the number of claim limitations that require this Court's construction, the parties agreed to focus on only those limitations that may be outcome determinative.  In this regard, on July 26, 2005, the parties agreed to adopt Dr. Baran's claim construction for only those limitations that would not impact the current infringement analysis, while reserving their rights to challenge the meaning and scope of these limitations in any future

13

action.  Accordingly, the parties have agreed to brief the remaining claim limitations that may be outcome determinative.

### A.  Disputed Limitations in Claim 7 of the '797 Patent

#### 1.  "a cannula mount affixing the cannula to the guide"

The parties' respective proposed constructions for interpreting the meaning of the limitation "a cannula mount affixing the cannula to the guide" are set forth below:

| Dr. Baran's Construction | MDTech's Construction |
|---|---|
| This limitation should be construed to mean "anything that affixes or connects the cannula to the guide." | Webster's Third New International Dictionary, copyright 2002, defines the term "mount" as "to become elevated by or secured to a support."<br><br>Webster's Third New International Dictionary, copyright 2002, defines the term "affixing" to mean "to attach physically."<br><br>The limitation should be construed as "a support which attaches the cutting cannula to the guide in a secured manner."<br><br>By way of further definition, the specification discloses the cannula mount 58 in Fig. 1 and the cannula mount 258 in Fig. 5. |

Claim 7 of the '797 patent requires a "cannula mount" that affixes the cannula to the guide.  In the context of this claim, the cannula mount is understood to join two claimed components – i.e., the cannula and the guide.  Accordingly, the ordinary and customary meaning of "cannula mount" to a person skilled in the art at the time of the invention is "anything that affixes or connects the cannula to the guide."

This construction finds support in the specification of the '797 patent, which discloses two embodiments of a "cannula mount."

In the Fig. 1 embodiment of the '797 patent, the cannula mount 58 includes a cylindrical collar 62 having a bore 69 at one end.  The bore 69 of the collar 62 is configured to receive the proximal end of the cannula 66 and secure it in any suitable manner.  The cylindrical collar 62 of

the cannula mount 58 also includes an internal threaded portion 72 at its other end to engage an external threaded portion 56 on the guide 18.

In the Fig. 5 embodiment of the '797 patent, the cannula mount 258 includes a base 262, a head 264, and a cylindrical housing 265.  The head 264 of the cannula mount 258 includes a bore configured to receive the proximal end of the cannula 266 and secure it in any suitable manner.  The base 262 of the cylindrical housing 265 can be inserted into a bore 255a in the guide 218 to secure it thereto.

In each embodiment, then, the "cannula mount" joins the cannula and guide and affixes these two components to each other.

MDTech's proposed construction of "cannula mount" is "a support."  The sole basis for MDTech's proposed construction is a general-purpose dictionary definition of the term "mount" used as a verb.  For that reason alone, this proposed construction is wrong.

In addition, and more fundamentally, MDTech's proposed construction is improper because use of a dictionary without consideration of the claims and specification of the '797 patent is in conflict with the law of claim construction according to <u>Phillips</u>.  <u>See</u> <u>Phillips</u>, 2005 WL 1620331, at *13.  From a plain reading of claim 7 and the specification of the '797 patent, the "cannula mount" is not "a support."[1]  Claim 7 and the specification of the '797 patent merely require that the "cannula mount" affix or connect the cannula to the guide.

Based on the foregoing, Dr. Baran respectfully requests that this Court adopt his proposed construction for this limitation, which is "anything that affixes or connects the cannula to the guide."

       2.    <u>"a manually operable charging member for moving the guide to the charged position against the urging of the coil spring"</u>

---

[1]    Although the cannula mounts 58, 258 described in the '797 patent <u>may</u> act as a support insofar as they support the cannula 66, 266, Dr. Baran refuses to concede that the "cannula mount" <u>must</u> act as a support.

The parties' respective proposed constructions for interpreting the meaning of the limitation "a manually operable charging member for moving the guide to the charged position against the urging of the coil spring" are set forth below:

| Dr. Baran's Construction | MDTech's Construction |
|---|---|
| "Charging member" means a member or mechanism that is used to create a charge or stored energy.  Therefore, this limitation should be construed to mean "a manually operable charging member or mechanism that is used to create a charge or stored energy, the charging member or mechanism configured to move the guide to the charged position against the urging of the coil spring." | Webster's Third New International Dictionary, copyright 2002, defines the term "manually" to mean "with or by means of the hands."<br><br>Webster's Third New International Dictionary, copyright 2002, defines the term "operable" to mean "fit, possible or desirable to use."<br><br>Webster's Third New International Dictionary, copyright 2002, defines the term "charging" as "charge."<br><br>Webster's Third New International Dictionary, copyright 2002, defines the term "member" to mean "a constituent part of a whole."<br><br>The limitation should be construed to mean "a charging member operable by means of the hand." |

Claim 7 of the '797 patent also requires "a manually operable charging member for moving the guide to the charged position against the urging of the coil spring."  When viewed in connection with the phrase "against the urging of the coil spring," it is clear that the manually operable "charging member" compresses the coil spring when the guide is moved to the charged position.  In the context of this claim, the term "charging member" means a member configured to create a charge or stored mechanical energy in the coil spring.  Therefore, the ordinary and customary meaning of "charging member" to a person skilled in the art at the time of the invention is "a member configured to create a charge or stored energy."

The specification of the '797 patent is also consistent with this meaning of the term "charging member."  It states:

> The instrument 10 may be converted from the discharged mode to the charged-safety-on mode, best shown in FIG. 2, by retracting the safety cap 20 toward the rear end 28 of the tube 26. ... This action causes the guide

16

> pins 94 (FIG. 3) to engage the annular external shoulder 54 of the spring
> guide 18 to retract the spring guide toward the base 44 of the support rod
> 14 and compress the coil spring 16. Thus, an easy functioning, manually
> operated charging means has been provided.

(Exh. A, col. 7, l. 4-17.)  In the described embodiment, the "charging member" includes cap 20, which is retracted to create stored energy in the spring 16.

The term " charging member" in claim 7 is not limited to a single component or structure. Rather, the ordinary and customary meaning of the term "member" encompasses a multi-component structure such as a mechanism or linkage assembly.  See CCS Fitness Inc., 288 F.3d at 1367 (court held that the ordinary and customary meaning of the term "member" encompassed a multi-component structure and was not limited to a single component structure).  Although the Fig. 1 and Fig. 5 embodiments of the '797 patent describe a "charging member" by reference to cap 20, the absence of a multi-component "charging member" discussed in the specification should not be used to narrow the ordinary and customary meaning of the term "member."  See CCS Fitness, 288 F.3d at 1368 (citing Johnson Worldwide Assoc., Inc. v. Zebco Corp., 175 F.3d 985, 992 (Fed. Cir. 1999)) ("[M]ere inferences drawn from the description of an embodiment of the invention cannot serve to limit claim terms.").  Accordingly, the term "charging member" includes a single component structure or a multi-component structure (e.g., a mechanism) configured to create a charge or stored energy.

Regarding MDTech's proposed construction, Dr. Baran disputes the phrase "the hand" to the extent that it suggests that the "charging member" can only be operated by one hand.  One-handed operation of the "charging member" is not required by claim 7 and, thus, the phrase "manually operable" should not be construed so narrowly.

Based on the foregoing, Dr. Baran respectfully requests that this Court adopt his proposed construction for this limitation, which is "a manually operable charging member or

mechanism that is used to create a charge or stored energy, the charging member or mechanism configured to move the guide to the charged position against the urging of the coil spring."[2]

3.     "a release means for retaining the guide in the charged position"

The parties' respective proposed constructions for interpreting the meaning of the limitation "a release means for retaining the guide in the charged position" are set forth below:

| Dr. Baran's Construction | MDTech's Construction |
|---|---|
| "Release means for retaining the guide in the charged position" should be construed according to 35 U.S.C. 112, ¶6.  The corresponding structure provided in the specification features a member having a latching portion configured to retain the guide in the charged position.  Therefore, this limitation should be construed to mean the corresponding structure described above and equivalents thereof. | This limitation should be construed according to 35 U.S.C. 112, ¶6.  The limitation should be construed to include the release lever 22, which is flexibly secured to the outer casing by a spot weld 104, the release lever 22, having a latching projection 102 for retaining the guide 18 in the charged position, as shown in the first embodiment of Figs. 1-4, and particularly in Figs. 1 and 2, and equivalents thereof.

In an alternative embodiment, the limitation should be construed to include the release lever 222, which is flexibly solvent-bonded to the outer casing 212 at 304, the release lever 222 having a latching projection 302 for retaining the guide 218 in the charged position, as shown in Figs. 5-8A, and particularly in Figs. 5 and 6, and equivalents thereof.

The recitation of the term "release" merely serves to further specify the function of the release lever 22, 222. |

Claim 7 of the '797 patent requires "a release means for retaining the guide in the charged position" (hereinafter "the retaining means element").  The parties agree that this clause should be construed in accordance with  35 U.S.C. 112, ¶6.

The first step in construing the retaining means element is to identify its stated function.  See IMS Tech. 206 F.3d at 1430.  The stated function of the retaining means element is signaled by the preposition "for," i.e., "retaining the guide in the charged position."  See Micro Chem., 194 F.3d at 1258.

_____

[2]       Although the parties' respective proposed constructions do not appear to differ materially from each other, the parties were unable to arrive at a mutually agreed upon construction.  In any event, Dr. Baran believes that the construction of this limitation has little bearing on the issue of infringement based, at least in part, on MDTech's apparent admission that the BioPince product meets this limitation. (See Exhibit D attached hereto, which includes excerpts of MDTech's Answers to Dr. Baran's Interrogatories.)

18

The next step in construing the retaining means element is to identify the structure or structures in the specification of the '797 patent that are necessary to perform this stated function.  See IMS Tech. 206 F.3d at 1430.  The structures disclosed in the specification of the '797 patent that perform this stated function are a lever 22 having a latching projection 102 of the Fig. 1 embodiment and a lever 222 having a latching projection 302 of the Fig. 5 embodiment.  The corresponding structure of the retaining means element is a lever incorporating a "latch" that is configured to retain the guide in the charged position.

35 U.S.C. 112, ¶6 only governs the portion of this limitation that includes the term "means" and the functional language that follows (i.e., "means for retaining the guide in the charged position").  Since the term "release" falls outside the means clause, it is not subject to 35 U.S.C. § 112, ¶ 6 treatment.

In the context of claim 7, the term "release" appears adjacent to the retaining means element.  This is best understood as requiring that the retaining means element is releasable — i.e., capable of being released.

MDTech's proposed construction identifies the corresponding structure as the release lever 22, 222 having a latching projection 102, 302.  MDTech also states in its construction that the recitation of the term "'release' merely serves to further specify the function of the release lever 22, 222," suggesting that the release lever 22, 222 must perform an additional function, i.e., "releasing the guide to the discharged position."  For the reasons that follow, MDTech's proposed construction is improper.

First, it is impermissible to construe a means clause by adopting a function different than the function expressly stated in the claim.  See Generation II Orthotics, Inc. v. Med. Tech., Inc., 263 F.3d 1356, 1364-65 (Fed. Cir. 2001) ("When construing the functional statement in a means-

plus-function limitation, we must take great care not to impermissibly limit the function by adopting a function different from that explicitly recited in the claim.") (citing <u>Micro Chem.</u>, 194 F. 3d at 1258); <u>see also</u> <u>Creo Products, Inc. v. Presstek, Inc.</u>, 305 F.3d 1337, 1345 (Fed. Cir. 2002 (only the function expressly stated in a means-plus-function clause is required by the claim, not subsidiary functions capable of being performed by the structure that performs the stated function).  Claim 7 of the '797 patent does not require the additional function that the retaining means element release the guide to the discharged position.  Claim 7 only requires that the guide be retained in the charged position.  Therefore, it would be improper to require the retaining means element to perform this additional function.

Second, MDTech's position, in effect, requires that the Court read into claim 7 extraneous limitations that are not there.  It is a canon of patent claim construction that importing limitations from the specification of a patent into a claim is forbidden.  <u>See</u> <u>Legett & Platt, Inc. v. Hickory Springs Mfg. Co.</u>, 285 F.3d 1357, 1371 (Fed. Cir 2002) ("In consulting the specification, ... the interpretative process may not import limitations from the specification in the defining language of the claims."); <u>see also</u> <u>Bell Atlantic Network Serv., Inc. v. Covad Comm. Group, Inc.</u>, 262 F.3d 1258, 1270 (Fed. Cir. 2001) ("We are mindful of the fact that limitations from the specification may not be read into the claims.").

Here, MDTech apparently seeks to read the "releasing the guide to the discharged position" limitation into claim 7 from the specification of the '797 patent to narrow this claim limitation.  As this is wrong as a matter of law, this construction must be rejected.

Based on the foregoing, Dr. Baran respectfully requests that this Court adopt his proposed construction for this limitation, which is "a releasable latch that is configured to retain the guide in the discharged position."

**B.      Disputed Limitations in Claim 2 of the '798 Patent**

1.      "biopsy actuator"

The parties' respective proposed constructions for interpreting the meaning of the

limitation "biopsy actuator" are set forth below:

| Dr. Baran's Construction | MDTech's Construction |
|---|---|
| "Biopsy actuator" means a mechanism for the removal of tissue. | The phrase "biopsy actuator" is defined by patentee at lines 2 and 3 of page 8 of the amendment filed on July 14, 1994 as "biopsy actuator 10." The patent specification shows reference numeral 10 in Fig. 1, for example, and the text of the patent refers to reference numeral 10 as "automated biopsy instrument" (see line 30 of column 5). The patentee defines the automated biopsy instrument 10 as comprising "seven principal elements, which will be more fully described hereinbelow: an outer casing 12; and inner support rod 14; a coil spring 16; a biopsy spring guide 18; a safety cap 20; a release lever 22; and a needle 24" (see lines 32-36 of column 5).<br><br>Therefore the phrase is construed to mean the automated biopsy instrument 10 having an outer casing 12; and inner support rod 14; a coil spring 16; a biopsy spring guide 18; a safety cap 20; a release lever 22; and a needle, as shown in Figure 1. |

Claim 2 of the '798 patent requires a "biopsy actuator."  In the context of this claim, the

term "biopsy actuator" is used to introduce a mechanism or subassembly that is part of the

biopsy instrument.  The "biopsy actuator" mechanism or subassembly is further defined in claim

2 by two components, i.e., the second connector means and the rapid advancing means, which

assist in the process of removing tissue.  Accordingly, the ordinary and customary meaning of

"biopsy actuator" to a person skilled in the art at the time of the invention is "a mechanism for

the removal of tissue."

MDTech argues that the term "biopsy actuator" means a laundry list of components,

namely an outer casing 12, an inner support rod 14, a coil spring 16, a biopsy spring guide 18, a

safety cap 20, a release lever 22, and a needle 24.  This construction, which is based solely on the

21

prosecution history during which Dr. Baran's counsel associated the reference numeral 10 with the term "biopsy actuator" in response to an office action, is flawed for several reasons.

First, MDTech's proposed construction is inconsistent with a plain reading of the claim. Since claim 2 of the '798 patent expressly recites "rapid advancing means" (i.e., a spring as admitted by MDTech in its proposed construction in claim 2), the biopsy actuator cannot include a spring since this would require the claimed invention to include two springs, which it does not. Expressed differently, the "rapid advancing means" limitation in claim 2 of the '798 patent would be redundant if the "biopsy actuator" inherently included a spring.

Second, the specification of the '798 patent flatly contradicts the construction advocated by MDTech.  For example, reference numeral 10 is associated with the "biopsy instrument" throughout the '798 patent.  There is not one indication in the '798 patent that associates the reference numeral 10 with the biopsy actuator.  In fact, the Summary of the Invention section of the '798 patent states that the "biopsy instrument 10 comprises a cannula and a biopsy actuator" (see col. 3, lines 42-44).  Based on this statement alone, it is plain that the "biopsy actuator" necessarily refers to something less than the complete biopsy instrument 10 because it is identified as a component of the biopsy instrument 10.

Finally, it is clear that Dr. Baran's counsel's association of reference numeral 10 to the "biopsy actuator" during the prosecution history was a mistake and not an attempt to change the meaning of the term "biopsy actuator."  Accordingly, it is improper for MDTech to rely on the prosecution history to construe the term "biopsy actuator, without considering the claims and the specification of the '798 patent."  See Inverness Med., 309 F.3d at 1380-82 (the ambiguity of the prosecution history made it less relevant to claim construction); Athletic Alternatives, 73 F.3d at

22

1580 (the ambiguity of the prosecution history made it "unhelpful as an interpretive resource" for claim construction).

Based on the foregoing, Dr. Baran respectfully requests that this Court adopt his proposed construction for this limitation, which is "a mechanism for the removal of tissue."

2.    "said proximal end having a first connector means secured thereto"

The parties' respective proposed constructions for interpreting the meaning of the limitation "said proximal end having a first connector means secured thereto" are set forth below:

| Dr. Baran's Construction | MDTech's Construction |
|---|---|
| "Connector means" should be construed as a connector, meaning anything that connects.  Therefore, this limitation should be construed to mean "the proximal end of the cannula having a first connector, which is anything that connects, secured thereto." | Webster's Third New International Dictionary, copyright 2002, defines the term "connector" to mean "something that connects." <br><br> The limitation should be construed to mean that "the proximal end of the cutting cannula includes a first means to connect." |

Claim 2 of the '798 patent requires the proximal end of the cannula to have a "first connector means" secured thereto.  Since the term "means" is used in this limitation, a presumption is established that 35 U.S.C. § 112, ¶6 applies.  However, that presumption is overcome since this limitation fails to recite a function that corresponds to the "means" element. Rodime PLC, 174 F.3d at 1302 ("[A] claim element that uses the word 'means' but recites no function corresponding to the means does not invoke § 112, ¶ 6.").  The parties are in agreement on this point.

Because the "first connector means" element does not qualify for 35 U.S.C. § 112, ¶ 6 treatment, it is not limited to the structure "described in the specification [of the '798 patent] and equivalents thereof."  35 U.S.C. § 112, ¶ 6.  Instead, the "first connector means" element should

be construed as a "first connector."  See Allen Engineering Corp. v. Bartell Industries, 299 F.3d 1336, 1347 (Fed. Cir. 2002).

In the context of claim 2, the "first connector" is required to engage the "second connector means."  In view of this requirement, a "connector" should be construed to mean anything that is capable of connecting or engaging another connector.  Nothing in the specification limits the meaning of the term "connector."  In the Fig. 1 embodiment, the female thread 74 of the cannula mount 58 engages the male thread 56 of the guide 18.  In the Fig. 5 embodiment, the base 262 of the cannula mount 258 is received within and engages the bore 255a of the guide 218.  These are merely two examples of a "connector" and the construction of the term "connector" should not be limited to these two examples.  See Legett & Platt, 285 F.3d at 1371 ("In consulting the specification, ... the interpretative process may not import limitations from the specification in the defining language of the claims."); see also Bell Atlantic, 262 F.3d at  1270 ("We are mindful of the fact that limitations from the specification may not be read into the claims.").

Based on the foregoing, Dr. Baran respectfully requests that this Court adopt his proposed construction for this limitation, which is "the proximal end of the cannula having a first connector, which is anything that connects, secured thereto."[3]

3.      "said biopsy actuator comprising a second connector means for releasably and fixedly engaging the first connector means"

---

[3]       Although the parties' respective proposed constructions do not appear to differ materially from each other, the parties were unable to arrive at a mutually agreed upon construction.  In any event, Dr. Baran believes that the construction of this limitation has little bearing on the issue of infringement based, at least in part, on MDTech's apparent admission that the BioPince product meets this limitation.  (See Exhibit D attached hereto, which includes excerpts of MDTech's Answers to Dr. Baran's Interrogatories.)

The parties' respective proposed constructions for interpreting the meaning of the limitation "said biopsy actuator comprising a second connector means for releasably and fixedly engaging the first connector means" are set forth below:

| Dr. Baran's Construction | MDTech's Construction |
|---|---|
| "Connector means" should be construed as a connector, meaning anything that connects. Therefore, this limitation should be construed to mean "the biopsy actuator comprising a second connector, which is anything that connects, the second connector being capable of being releasably and fixedly engaged with the first connector." | 35 U.S.C. § 112, ¶ 6 applies to the limitation of the "second connector means for releasably and fixedly engaging the first connector means" <br><br> Webster's Third New International Dictionary, copyright 2002, defines "releasably" as "capable of being released." <br><br> The limitation "a second connector means for releasably and fixedly engaging the first connector means" means the biopsy spring guide 18, including the quarter-turn male thread 56, as shown in Fig. 1, 1A, 2, 3, 4 and 4A, and as described in the specification at line 10 of column 6 through line 40 of column 9, and equivalents thereof. |

Claim 2 of the '798 patent requires the biopsy actuator to include "a second connector means for releasably and fixedly engaging the first connector means" (hereinafter "the second connector means element"). Since the term "means" is used in the second connector means element, a presumption is triggered that 35 U.S.C. § 112, ¶6 applies.

To rebut the presumption that 35 U.S.C. § 112,¶ 6 applies, the claim must recite sufficient structure for performing the stated function in the claim. Cole, 102 F.3d at 531 ("To invoke [§ 112, paragraph 6], the alleged means-plus-function claim element must not recite a definite structure which performs the described function.").

A claim recites sufficient structure if "the 'term, as the name for structure, has a reasonably well understood meaning in the art.'" Watts, 232 F.3d at 880-81 (quoting Greenberg, 91 F.3d at 1583); see also Sage Products, 126 F.3d at 1427-28 ("[W]here a claim recites a function, but then goes on to elaborate sufficient structure, material or acts within the claim itself to perform entirely the recited function, the claim is not in means-plus-function format."). Claim

2 of the '798 patent recites sufficient structure to perform the stated function recited in the second connector means element (i.e., "releasably and fixedly engaging the first connector means").  For example, the term "connector" precedes the term "means" in the second connector means element, just as it does with the first connector means element.  The term "connector" is itself a structural term as persons skilled in the art would understand that a "connector" inherently performs the function of "releasably and fixedly engaging" another connector.  Moreover, claim 2 recites additional structure by providing details regarding the connector to which it engages (i.e., the first connector means).

Across many industries, the term "connector" is used to define a structure that is inherently capable of releasably and fixedly engaging another mating connector.  Exemplary "connectors" in the practice of medicine include mechanical connectors (e.g. for fluid transfer), electrical connectors (e.g., for monitoring vital signs), and computer connectors (e.g., for imaging equipment).  To better illustrate the inherent functions of a connector, a brief discussion of one specific type of computer connector, the Universal Serial Bus (USB) connector, is provided.

A typical USB peripheral-to-computer connection includes two connectors as shown below — a first USB connector (also referred to as a "port") is provided in the computer ("the computer USB connector") and a second USB connector is usually provided at the end of a cable that extends from a peripheral device (e.g., mouse, keyboard, etc.) ("the peripheral device USB connector").  See http://www.usb.org.



computer USB connector



peripheral device USB connector

To connect the peripheral device to the computer, the peripheral device USB connector is plugged into the computer USB connector.  Once plugged in, the peripheral device USB connector is "fixedly engaged" with the computer USB connector to permit operation of the peripheral device.  In this state, the peripheral device USB connector is also considered to be "releasably engaged" with the computer USB connector because it can be removed from the computer USB connector with a requisite amount of force to disengage it therefrom.  The force required to remove the peripheral device USB connector from the computer USB connector may vary (e.g., the force may be large if the connection is an extremely tight fit or small if it is a relatively loose fit).  Regardless of the amount of force required to disengage the peripheral device USB connector from the computer USB connector, it is understood that the peripheral device USB connector is still considered to be "releasably engaged."

Several Federal Circuit decisions also support Dr. Baran's proposed construction that the term "connector" defines sufficient structure to place the second connector means element outside of 35 U.S.C. § 112, ¶ 6 treatment.  For example, in <u>Allen Engineering</u>, 299 F.3d at 1347, the Federal Circuit held that numerous uses of the term "means" preceded by structural terms fell outside of 35 U.S.C. 112, ¶6, because these elements recited sufficient structure well understood by those skilled in the art to (e.g., connecting shaft means, fork means, cable means, and lever arm means).  In <u>Envirco Corp. v. Celestra Cleanroom, Inc.</u>, 209 F.3d 1360, 1365 (Fed. Cir. 2000), the Federal Circuit found the term "baffle" in "baffle means for ... directing airflow" to be itself a structural term because examples of baffles were provided in a dictionary.  In <u>Cole</u>, the Federal Circuit held that the limitation "perforation means . . . for tearing" was not a means-plus-function clause under 35 U.S.C. 112, ¶6, because the claim sufficiently described a structure (i.e., the perforation itself) to perform the function of tearing.  <u>Cole</u>,102 F.3d at 531.

The specification of the '798 patent also supports Dr. Baran's construction.  In the Fig. 1 embodiment, the female thread 74 of the cannula mount 58 is fixedly and releasably engaged with the male thread 56 of the guide 18 during assembly/disassembly of the biopsy instrument 10.  In the Fig. 5 embodiment, the base 262 of the cannula mount 258 is fixedly and releasably engaged with the bore 255a of the guide 218 during assembly/disassembly of the biopsy instrument 210.  In both Fig. 1 and Fig. 5 embodiments, however, the cannula mounts 58, 258 are not releasable during operation of the biopsy instrument.

Moreover, the summary section of the '798 patent states that the "biopsy actuator further includes a second connector." (Exh. B, col. 3, l. 58-59.)  This statement provides further evidence that second connector means should be construed as a "second connector."

28

Because the second connector means element does not qualify for 35 U.S.C. § 112, ¶ 6 treatment, it is not limited to the corresponding structures in the specification and equivalents thereof.  Instead, it is construed according to standard rules of claim construction.

In the context of this claim, the term "releasably" requires that the "second connector means" be releasable from the "first connector means."  In other words, the "second connector means" must be capable of being released from the "first connector means."

Based on the foregoing, Dr. Baran respectfully requests that this Court adopt his proposed construction for this limitation, which is "a second connector that is capable of releasably and fixedly engaging the first connector."

    4.    <u>"said stylet means being detachable from said cannula"</u>

The parties' respective proposed constructions for interpreting the meaning of the limitation "said stylet means being detachable from said cannula" are set forth below:

| Dr. Baran's Construction | MDTech's Construction |
|---|---|
| This limitation should be construed to mean "the stylet is capable of being decoupled or disassembled from the cannula." | Webster's Third New International Dictionary, copyright 2002, defines "detachable" as "capable of being separated or withdrawn without loss or damage." <br><br> This limitation should be construed to mean "the thin wire with a sharpened point is capable of being separated or withdrawn from the cutting cannula without loss or damage." |

Claim 2 of the '798 patent requires that the stylet be "detachable" from the cannula.  In the context of this claim, the term "detachable" means that the stylet is capable of being detached from the cannula.

In view of the specification of the '798 patent, the stylet is detachable from the cannula during assembly/disassembly of the instrument.  For example, regarding the Fig. 1 embodiment, the specification states that "the stylet 60 is telescopically or coaxially received within the cannula mount 58 to assemble the needle 24" during assembly of the biopsy instrument (<u>Id.</u>, col.

7, l. 36-37.)    In other words, the needle 24 is assembled by inserting the stylet 60 into the cannula 66 such that the stylet 60 telescopically slides within the cannula 66.  Similarly, regarding the Fig. 5 embodiment, the needle is assembled by inserting the stylet 260 into the cannula 266 such that the stylet 260 telescopically slides within the cannula 266.  Hence, in both embodiments, the stylet is capable of being decoupled or disassembled from the cannula.

Claim 2 does not specify when the stylet is capable of being decoupled or disassembled from the cannula.  During normal operation of the biopsy instrument, the stylet is not decoupled or disassembled from the cannula.  Therefore, in view of the specification of the '798 patent, the stylet need only be "capable of being decoupled or disassembled" from the cannula during assembly and/or disassembly of the biopsy instrument.

Accordingly, the ordinary and customary meaning of "detachable" to a person skilled in the art at the time of the invention is "capable of being decoupled or disassembled."

MDTech, in contrast, proposes that the term "detachable" means that the stylet is "capable of being separated or withdrawn from the ... cannula without loss or damage."  MDTech's construction is based solely on the Webster's Third New International Dictionary, copyright 2002, general-purpose dictionary.   This proposed construction is incorrect for several reasons.[4]

First, the '798 patent does not support this construction.  Claim 2 does not include an express limitation that "loss or damage" is required during disassembly of the cannula and stylet.  Moreover, the specification does not mention avoidance of loss or damage when the stylet is

---

[4]        MDTech's proposed construction also fails to specify which components must avoid loss or damage when the stylet is separated from the cannula.  Is it the stylet? The cannula? The entire biopsy instrument?  Without more, MDTech's proposed construction is unclear.

decoupled from the cannula.  Claim 7 and the specification of the '798 patent only call for the stylet to be capable of being decoupled or disassembled from the cannula.

Second, it is impermissible for MDTech to rely solely on a general purpose dictionary to construe the term "detachable" since its own dictionary and other general purpose dictionaries include definitions lacking the "without loss or damage" qualifier.  See Phillips, 2005 WL 1620331, at *15 ("[D]ifferent dictionaries may contain somewhat different sets of definitions for the same words. A claim should not rise or fall based upon the preferences of a particular dictionary editor, or the court's independent decision, uninformed by the specification, to rely on one dictionary rather than another.").  For example, Webster's Third New International Dictionary®, copyright 2002, includes the following additional definition of the term "detachable": capable of being or designed to be detached.  Additionally, the American Heritage® Dictionary of the English Language, Fourth Edition, copyright 2000, includes the following definitions of the term "detach": (i) to separate or unfasten, disconnect and (ii) to remove from association or union with something.  Based on these exemplary definitions, it is clear that MDTech sought out and eventually identified the narrowest definition of the term "detach," rather than construe the claim term in view of claim 2 and the specification of the '798 patent.

Based on the foregoing, Dr. Baran respectfully requests that this Court adopt his proposed construction for this limitation, which is "the stylet is capable of being decoupled or disassembled from the cannula."

## V.  CONCLUSION

For the foregoing reasons, Dr. Baran respectfully requests that this Court construe the claims at issue in a manner consistent with his proposed constructions.


Respectfully submitted,


DATED:  July 29, 2005                         /s/ Steven M. Auvil
                                              Steven M. Auvil (0063827)
                                              sauvil@bfca.com
                                              Gregory S. Kolocouris (0074806)
                                              gkolocouris@bfca.com
                                              **BENESCH, FRIEDLANDER,**
                                              **  COPLAN & ARONOFF LLP**
                                              2300 BP Tower, 200 Public Square
                                              Cleveland, Ohio  44114-2378
                                              Telephone:  (216) 363-4500
                                              Facsimile:  (216) 363-4588

                                              Attorneys for Plaintiff
                                              **GREGORY W. BARAN, M.D.**

CERTIFICATE OF SERVICE

I hereby certify that on July 29, 2005, a copy of the foregoing PLAINTIFF GREGORY W. BARAN, M.D.'S BRIEF REGARDING DISPUTED CLAIM CONSTRUCTION ISSUES was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

/s/ Steven M. Auvil
One of the Attorneys for Plaintiff
**GREGORY W. BARAN, M.D.**

33