UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |  |
|---|---|---|
| **GREGORY W. BARAN, M.D.,** | : | **Case No. 1:04cv1251** |
|  | : |  |
| **Plaintiff,** | : | **JUDGE KATHLEEN O'MALLEY** |
|  | : |  |
| **v.** | : | |
|  | : |  |
| **MEDICAL DEVICE** | : | **OPINION & ORDER** |
| **TECHNOLOGIES, INC., et al.,** | : |  |
|  | : |  |
| **Defendants.** | : |  |

Plaintiff Gregory W. Baran, M.D. ("Baran" or "Plaintiff") brings this patent infringement suit against Defendants Medical Device Technologies, Inc. ("MDTech"), Gedon AB ("Gedon"), Ascendia AB ("Ascendia"), and Anders H. Weilandt ("Weilandt") (Gedon, Ascendia, and Weilandt are hereinafter collectively referred to as "the Swedish defendants"), alleging infringement of two patents directed at an automated biopsy instrument that, according to the Complaint,[1] are issued to and owned by Baran. Specifically, Baran alleges in his Complaint that (1) the Swedish defendants have infringed rights that Baran holds in U.S. Patent Nos. 5,025,797 ("the '797 patent") and 5,400,798 ("the '798 patent") by offering for sale, selling and/or distributing the BioPince and Express biopsy instruments in the United States, and (2) MDTech has infringed Baran's rights in the '797 and '798 patents by importing, offering for sale, and/or selling the BioPince biopsy instrument in the United States. Baran alleges that all defendants have directly and/or indirectly infringed one or more claims of the '797 and '798 patents and that such infringement was willful and deliberate.

---

[1] "Complaint" refers to Dr. Baran's *Second Amended Complaint for Willful Patent Infringement* (Doc. 60).

Pursuant to *Markman v. Westview Instruments*, 517 U.S. 370 (1996), this Opinion and Order construes, as a matter of law, the disputed claim terms of the patents at issue in this case.

## I.    BACKGROUND

Baran is an individual residing in Ohio who is the inventor of the claimed subject matter of the '797 and '798 patents.  MDTech is a Delaware corporation with its principal place of business in Gainesville, Florida.  Among others, MDTech imports and sells the BioPince biopsy instrument, one of the alleged infringing devices in this case.  In response to Plaintiff's Complaint, MDTech has answered and asserted counterclaims for declaratory judgment of non-infringement as to both patents.

The status of the Swedish defendants in this matter is more complicated for a variety of reasons, and the Court is unaware of their status and participation in this case at this time.[2]  Indeed, as of the date of this opinion, none of the Swedish defendants have participated in any substantive aspect of this case, including claim construction, either by way of written submissions or oral argument.  Based on the way this case has proceeded, it appears that there is not likely to be any active participation by the Swedish defendants as it relates to the substantive question of infringement. As such, although the Court postponed the originally scheduled claim construction

---

[2]  As the docket of this case reflects, there have been a number of issues involving the Swedish defendants relating to the proper entities or persons to be named as defendants, the adequacy of service of those defendants, and the Court's personal jurisdiction over them.  The Court does not now detail those issues, other than to note that efforts at resolving those issues were stonewalled by the conduct of counsel for AMT Sverige AB (a defendant named in the First Amended Complaint that, according to Plaintiff, entered into voluntary dissolution in part to avoid this litigation), a tactic that this Court ultimately found to be in violation of the Federal Rules of Civil Procedure and this Court's inherent powers.  That strategy resulted in sanctions.  It also delayed the efficient progression of this case and, ultimately, left the status of the Swedish defendants in this matter uncertain.

hearing in this matter while the questions of service and personal jurisdiction as to one Swedish entity were being investigated and briefed, and while Plaintiff was determining the proper entities to be named as defendants in this case, it ultimately proceeded with a claim construction hearing without the Swedish defendants so as not to further delay the case. In any event, Plaintiff alleges that MDTech imports and sells the same accused device - the BioPince - that the Swedish defendants are alleged to have distributed. In addition, the other allegedly infringing biopsy instrument the Swedish defendants distribute - the Express - apparently is identical to the BioPince except for the color of its handle. All claim construction issues are, accordingly, sufficiently ripe for this Court's consideration.

Prior to the *Markman* hearing, according to the initial Case Management Plan in this matter, Plaintiff and MDTech first submitted a joint claims construction chart, identifying areas of agreement and areas of dispute; later, they submitted separate briefs urging a certain construction for each disputed claim term. The initial claims construction chart indicated that the parties[3] were in dispute over the construction of ten terms contained in claim 7 the `797 patent and ten terms contained in claim 2 of the '798 patent. As often happens, however, the parties' subsequent briefing narrowed the issues substantially, and the parties' briefs focused only on those terms that the parties agreed may be outcome determinative, a number totaling seven terms between the two patents.

Having considered the parties' briefing and oral arguments, the Court sets out its analysis and construction of the disputed claim language below, after first outlining the applicable legal standards.

---

[3] The "parties" hereinafter refers to Baran and MDTech, as those were the only two parties participating in the claim construction process in this matter.

3

## II.    LEGAL STANDARDS

The construction of a patent and the terms contained therein is an issue to be determined by the Court, as a matter of law.  *Markman*, 52 F.3d at 976, *aff'd*, 517 U.S. 370, 372 (1996).  In construing a claim, the Court determines "the meaning and scope of the patent claims asserted to be infringed." *Id.*  Construction of the claims is the first step in a "two-step analysis" of infringement. *Elekta Instrument S.A. v. O.U.R. Scientific Int'l., Inc.*, 214 F.3d 1302, 1306 (Fed. Cir. 2000).

"In construing claims, the analytical focus must begin and remain centered on the language of the claims themselves, for it is that language that the patentee chose to use to 'particularly point [ ] out and distinctly claim[ ] the subject matter which the patentee regards as his invention.'" *Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001) (quoting 35 U.S.C. § 112, ¶ 2); *see also Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) ("the claims themselves provide substantial guidance as to the meaning of particular claim terms").  To ascertain the meaning of the claims, a court primarily should consider three things: the language of the patent claims, the patent specification, and the prosecution history. *Insituform Techs., Inc. v. Cat Contracting, Inc.*, 99 F.3d 1098, 1105 (Fed. Cir. 1996); *Markman*, 52 F.3d at 979.  The claim language itself defines the scope of the claim, and "a construing court does not accord the specification, prosecution history, and other relevant evidence the same weight as the claims themselves, but consults these sources to give the necessary context to the claim language." *Eastman Kodak Co. v. Goodyear Tire & Rubber Co.*, 114 F.3d 1547, 1552 (Fed. Cir. 1997) (overruled on other grounds by *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448 (Fed. Cir. 1998)).  Thus, a court should construe claim terms as having the meaning ascribed to them by one of ordinary skill in the art unless the patent specification or prosecution history indicates a contrary meaning.

4

*Phillips*, 415 F.3d at 1313 ("the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification."); *see also Northern Telecom Ltd. v. Samsung Electronics*, 215 F.3d. 1281, 1287 (Fed. Cir. 2000) ("Claim language is given its ordinary and accustomed meaning except where a different meaning is clearly set forth in the specification or where the accustomed meaning would deprive the claim of clarity.")

In determining the meaning to be given claim terms, those terms must be read in the context of the specification because it is the patent specification which, by statute, must contain a "full, clear, concise, and exact" description of the invention. 35 U.S.C. § 112, ¶ 1; *Phillips*, 415 F.3d at 1311. Thus, claim terms must be construed so as to be consistent with the specification. *Id.* at 1315. But that does not change the fact that it is the language of the claim that is being construed, and not the specification. *See id.* at 1312-13, 1316 ("The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." (quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998))).

In some circumstances, the specification may teach that a claim term is to be given a meaning which differs from the ordinary meaning of such term. For example, the patentee may use the specification as a sort of dictionary, by defining expressly the terms used in the claims. *Markman*, 52 F.3d at 979. In such instances, the patentee is deemed to have acted as his own lexicographer, and it is those definitions, even if they dictate unusual meanings for the language employed, which must control. *Texas Digital*, 308 F.3d at 1204.

Care must be used in reading the specification, however, because while a patentee can "act

5

as his own lexicographer to specifically define terms of a claim contrary to their ordinary meaning, the written description in such a case must clearly redefine a claim term so as to put a reasonable competitor or one reasonably skilled in the art on notice that the patentee intended to so redefine that claim term." *Elekta*, 214 F.3d at 1307 (quoting *Process Control Corp. v. HydReclaim Corp.*, 190 F.3d 1350, 1357 (Fed. Cir. 1999)) (internal quotation marks omitted).

Although claims must be read in view of their specification, the Federal Circuit repeatedly has cautioned against limiting the scope of a claim to the preferred embodiment or specific examples disclosed in the specification. *See Ekchian v. Home Depot, Inc.*, 104 F.3d 1299, 1303 (Fed. Cir. 1997) ("While examples disclosed in the preferred embodiment may aid in the proper interpretation of a claim term, the scope of a claim is not necessarily limited by such examples"); *Intervet America, Inc. v. Kee-Vet Labs., Inc.*, 887 F.2d 1050, 1053 (Fed. Cir. 1989) ("limitations appearing in the specification will not be read into claims, and . . . interpreting what is <u>meant</u> by a word <u>in</u> a claim 'is not to be confused with adding an extraneous limitation appearing in the specification, which is improper'") (emphasis in original) (citation omitted). Similarly, both the Federal Circuit and the Supreme Court have cautioned against using the specification to expand the scope of the claims. *Johnson & Johnston Assocs. Inc. v. R.E. Service Co., Inc.*, 285 F.3d 1046, 1052 (Fed. Cir. 2002) (citing *McClain v. Ortmayer*, 141 U.S. 419, 424 (1891) ("The claim is the measure of [that patentee's] right to relief, and while the specification may be referred to to limit the claim, it can never be made available to expand it.")).

Beyond the specification, the Court may also look to the patent's prosecution history if it is a part of the record in the case. *Markman*, 52 F.3d at 980. "This 'undisputed public record' of proceedings in the Patent and Trademark Office ["PTO"] is of primary significance in understanding

6

the claims." *Id.*; *Phillips*, 415 F.3d at 1317 ("Like the specification, the prosecution history provides evidence of how the PTO and inventor understood the patent.") Again, however, although the prosecution history "can and should be used" when construing the claims, it "cannot 'enlarge, diminish, or vary' the limitations in the claims." *Markman*, 52 F.3d at 980 (citation omitted).

In addition to the intrinsic record, the Court may also consider extrinsic evidence such as dictionaries, encyclopedias, treatises and inventor and expert testimony to assist it in understanding the technology at issue or in determining the meaning or scope of terms in a claim. *Phillips*, 415 F.3d at 1317-18; *see also Aqua-Aerobic Sys., Inc. v. Aerators, Inc.*, 211 F.3d 1241, 1244-45 (Fed. Cir. 2000); *Hoechst Celanese Corp. v. BP Chemicals Ltd.*, 78 F.3d 1575, 1579 (Fed. Cir. 1996), *cert. denied*, 117 S.Ct. 275 (1996).  While such evidence is generally considered less reliable than the intrinsic record (for a variety of reasons), the Court is free to consider it, and may do so at any stage of its inquiry. *Phillips*, 415 F.3d at 1318-19; *see also Free Motion Fitness, Inc., v. Cybex Int'l, Inc.*, 423 F.3d 1343, 1348-49 (Fed. Cir. 2005).

A final claim construction principle must also be mentioned in the context of this case: so-called means-plus-function claiming pursuant to 35 U.S.C. § 112, ¶ 6.  Section 112, ¶ 6 provides that:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification or equivalents thereof.

This paragraph "allows a patentee to recite a function to be performed as a claim limitation rather than reciting structure or materials for performing that function." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1321 (Fed. Cir. 2003).  In determining whether Section 112, ¶ 6 applies, the

Federal Circuit has explained that "the use of the word 'means' triggers a presumption that the inventor used this term advisedly to invoke the statutory mandates for means-plus-function clauses." *York Products, Inc. v. Central Tractor Farm & Family Center*, 99 F.3d 1568, 1574 (Fed. Cir. 1996). Two rules, however, may overcome that presumption.  First, "a claim element that uses the word 'means' but recites no function corresponding to the means does not invoke § 112, ¶ 6." *Rodime PLC v. Seagate Tech., Inc.*, 174 F.3d 1294, 1302 (Fed. Cir. 1999).  Second, "even if the claim element specifies a function, if it also recites sufficient structure or material for performing that function, § 112, ¶ 6 does not apply." *Id.*

Once a court determines that § 112, ¶ 6 applies, construction of a means-plus-function term involves two steps.  First, the court must identify the claimed function, "staying true to the claim language and the limitations expressly recited by the claims." *Omega Eng'g, Inc.*, 334 F.3d at 1321. Next, a court must "ascertain the corresponding structures in the written description that perform those functions." *Id.*  A structure is corresponding "only if the specification or the prosecution history clearly links or associates that structure to the function recited in the claim." *Id.* (*quoting B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997)).

With all of these principles in mind, the Court turns to the parties' dispute over the claim language employed in the patents at issue in this case.

## III.    CONSTRUCTION ANALYSIS

### A.    Overview of the Invention[4]

As mentioned at the outset, Baran's patents are directed at an automated biopsy instrument. To give context to Baran's invention and the problems it was intended to remedy, the Court first reviews biopsy instruments in general before addressing Baran's specific invention.[5]

A biopsy instrument, generally, is a device for removing a sample of tissue from a human being or animal for diagnosis.  Prior to the advent of biopsy instruments, tissue specimens primarily were obtained through invasive exploratory surgery.  Biopsy instruments enabled medical professionals to obtain tissue samples with less risk of trauma and damage to a patient.  Most contemporary biopsy instruments remove the tissue sample through the use of a two part needle set comprised of a stylet, which is a slender probe or wire, and a cannula, which is a hollow tube that surrounds the stylet and can be inserted into the body.  The cannula, and sometimes the stylet, are sharp or pointed so that they are capable of cutting through or piercing tissue.

There are two primary methods of obtaining a tissue specimen that the parties described in their briefs and at the *Markman* hearing.  Each method involves the use of a different type of needle. The first method employs a slotted needle, which includes a sharpened stylet containing a gap near its distal end (the end farthest from the point of attachment) that acts as a tissue pocket.  An

---

[4]  The claims at issue in this case, although from two different patents, refer to the same invention.  The '798 patent is a later filed Continuation-in-Part of the '797 patent, but the new matter introduced in the '798 patent is not at issue here.  The portions of the '797 specification and '798 specification relevant to the Court's analysis, therefore, are nearly identical.  To avoid redundancy, the Court cites only to the '797 specification in providing a general overview of the invention.

[5]  The following information was gleaned by the Court from the parties' briefs, the parties' oral arguments, the prior art disclosed in the patents at issue, and the patents themselves.

9

illustration of a slotted needle, taken from Figure 9 of the '797 patent, is shown to the right.  As described in the specification as one type of needle the invention can utilize, the stylet **60a** contains a gap **60b** near its sharpened distal end **78a.** ('797 patent, col. 8, l. 26-32.)  The tube not identified in Figure 9 surrounding



FIG. 9

the left portion of the stylet is the cannula.  When using a slotted needle, the user first inserts the stylet into the desired tissue area with the cannula retracted, or not covering the stylet. The user then advances the cannula over the stylet, capturing the tissue in the slot or gap in the stylet.  The entire needle is then withdrawn from the patient, with the sample still captured in the slot.

The other method involves a full-core needle, which, as the name implies, employs a stylet that does not contain a slot or gap.  With this method, the cannula extends beyond the stylet and is inserted into the tissue.  The tissue sample fills the hollow portion of the cannula.  Once the needle is withdrawn from the patient, the stylet can then be advanced into the cannula to eject the sample from the cannula.  Typically, this method requires some sort of negative pressure or suction to ensure that the specimen actually stays inside the cannula when it is withdrawn.  Counsel for MDTech analogized this method to putting a straw in a cola bottle - a user needs to put his finger over the straw when it is removed in order to capture some cola in the straw.  (Transcript from *Markman* Hearing (hereinafter, "Tr."), at 76.)

Each method has advantages and disadvantages.  The slotted needle method has the advantage of being more likely to obtain the specimen when the needle is withdrawn because it literally traps the specimen in the needle.  Because the full-core needle does not trap the specimen and typically requires negative pressure or suction, it is less likely that it will be successful in

10

removing the specimen.  The disadvantages of the slotted needle, however, are that the size and weight of the specimens that this needle obtains are smaller because the entire cannula tube is not filled with the tissue specimen, as with the full-core needle.  In addition, the slotted needle is limited in that smaller sized needles cannot be used.  This is because the stylet of the slotted needle is thinner than the full core needle and, therefore, becomes more flexible and less stable at smaller sizes.  This becomes an issue because certain tissue masses apparently require the use of smaller needles. Conversely, while the full-core needle is advantageous because it provides a larger (and, therefore, potentially better) sample size and can accommodate smaller needle sizes,  it is not as consistent in actually obtaining the desired specimen.  As it relates to the issues before the Court, it is important to note that each needle is desirable in different situations.

In different biopsy instruments, movement of the stylet and cannula can be manual, semi-automated, or automated.  A manually operated biopsy device, of course, requires the user to move the cannula and the stylet by hand.  The semi-automated and automated biopsy instruments, however, contain some sort of part or mechanism to move either the cannula, the stylet, or both.  For example, the patents at issue in this case describe prior art that discloses an instrument in which an electrical motor powers a pair of serrated scalpel blades (U.S. Patent No. 3,452,741 (1969)), in which a stylet is manually advanced and the cannula is released by depressing a trigger (U.S. Patent No. 4,667,684 (1987)), in which a spring-loaded stylet advances into the tissue followed by a delayed release of a spring-loaded cannula (U.S. Patent No. 4,699,154 (1987)), and in which a slidable stylet is manually advanced into the tissue mass and a spring-loaded cannula is released and driven over the stylet (U.S. Patent No. 4,600,014 (1986)).  The benefits of the semi-automated and automated devices over the manual devices are that the cutting motion is swifter, which causes a cleaner cut,

11

does less damage to the surrounding tissue, and shortens the length of the procedure; the automated devices are more accurate; and there is less risk of inherent human error in operating the cannula and stylet.

With that background, the Court now turns to the patents at issue in this case.  The '797 patent was filed on March 29, 1989 and issued on June 25, 1991, and the '798 patent was filed as a Continuation-in-Part of the '797 patent on April 23, 1993 and issued on March 28, 1995.  As the prior art above shows, the invention disclosed in these patents was not the first for an automated biopsy instrument; it was an improvement on existing automated instruments.  In the Background of the Invention, the patent identifies certain problems with instruments known at the time, primarily related to the ease of use and risk of accident.  Specifically, the patent explains that "the various automated biopsy instruments presently known tend to be heavy, difficult to manipulate, and incorporate biasing mechanisms[6] which are either complicated in construction or require undue force to operate."  ('797 patent, col. 3, l. 8-12.)   In addition, the Background of the Invention identifies the possibility of "inadvertent movement or torque," especially in the case of instruments that permit or require elements to be manually adjusted prior to advancement of the cannula.  (*Id.*, col. 3, l. 14-20).  Likewise, some instruments contain a moveable stylet that extends beyond the rear of the instrument, leaving it vulnerable to accidental impact and inadvertent advancement into the body.  (*Id.*, col. 2, 1. 37-47.)  Finally, the Background of the Invention notes that the known instruments have <u>exposed</u> triggers or releases that actuate the movement of the cannula or stylet, thus further creating the risk of accidental advancement of the cannula.  (*Id.*)

---

[6] Biasing mechanisms are the mechanisms that charge and discharge the cannula and the stylet for advancement into the tissue.  The parties agree on the meaning of this phrase.

12

To address those perceived problems, the '797 patent provides an instrument with a stationary stylet that, once mounted to the instrument, cannot be moved inadvertently or otherwise. (*Id.*, col. 3, 1. 30-35.)  It also describes a guide on which a cannula can be mounted that can be manually moved to the charged position against the urging of a biasing mechanism such as a coil spring, and can be released to the discharged position, advancing in the direction of the stylet by a manually actuable release means.  (*Id.*, col. 2, 1. 35-44.)  To address the problem of an exposed trigger or release, the patent describes that, "[i]n the preferred embodiments of the invention, a shield means is provided which is disposed to block or prevent inadvertent actuation of the release means." (*Id.*, col. 2, 1. 58-60.)  In addition, the patents contain preferred embodiments that can employ both the slotted needle and the full-core needle interchangeably.

There are two basic embodiments in the '797 and '798 patents.  One embodiment, depicted in Fig. 1 of both patents, relates to a reusable configuration that permits needle sets to be used and replaced, so that the instrument can be used multiple times for multiple patients.  The second embodiment, depicted in Fig. 5 of both patents, relates to a single use configuration that can be used on only one patient.  An exploded view of the first embodiment, taken from Fig. 1, is shown on the next page:

13



FIG. 1

The automated instrument **10** as shown in Fig. 1 includes the following primary components**:**

an outer casing **12**; a support rod **14**; a coil spring **16**; a biopsy spring guide **18**; a safety cap **20**; a

release lever **22**; and a needle **24**.  ('797 patent, col. 4, l. 47-51.)  A needle **24** is not shown in this

14

illustration (it is shown in Figure 1A), but it comprises a stylet **60** and a cannula mount **58**, which, in turn, comprises a cylindrical collar **62**, a conical head **64**, and a cutting cannula **66**.  (*Id.*, col. 4, l. 37-40.)  Although the operation of the device depicted in Fig. 1 will be discussed in greater detail below in the context of the disputed claim language, some points are worth noting here.

According to the Detailed Description of the Invention, the instrument is converted from the discharged mode to the charged-safety-on mode (meaning it is ready to fire, but there is a shield over the release) by retracting the safety cap **20** toward the rear end **28** of the tube **26**.  (*Id.*, col. 7, l. 4-7.) This action causes the guide pins **94** to engage the annular external shoulder **54** of the spring guide **18** to retract the spring guide toward the base **44** of the support rod **14** and compress the coil spring **16**.  (*Id.*, col. 7, l. 12-16.)  In other words, according to that description, the charge is created when the safety cap is pulled backward and the guide pins on the inside of the safety cap structure catch the shoulder of the spring guide, which compresses the spring back toward the base.  This action creates the charge that, once the release is pressed, causes the cannula to advance forward over the stylet.

As between Fig. 1 (the reusable embodiment) and Fig. 5 (the single use embodiment), the most significant difference for purposes of the Court's present analysis is the cannula mount, specifically the cannula mount's interaction with the spring guide.  The relevant portion of Fig. 5 is shown to the right.  As depicted, rather than have a screw-on feature like the cannula mount in Fig. 1, this embodiment has a plug-in type feature, where the cannula mount **258** receives the cannula **266** on one end and plugs into the



15

guide **218** by inserting the base **262** into a bore **255a** in the guide.

These descriptions of the invention are meant to provide some background to the claims at issue in this case.  The remaining elements of the invention will be discussed below, where applicable, in the context of the disputed claim language.

### B.    Disputed Claim Terms

Plaintiff alleges that the accused devices infringe claim 7 of the '797 patent and claim 2 of the '798 patent.  Below are the claims in full, with the disputed terms in bold:

> 7. A biopsy instrument comprising an elongate hollow casing, a needle extending outwardly from the casing and having a cannula and a stylet received within the cannula, a stationary support mounted within the casing in fixed relation thereto and having means affixing the stylet thereto, a cannula guide, **a cannula mount affixing the cannula to the guide**, the guide being completely enclosed by the casing for reciprocating movement therewithin relative to the stationary support between a charged position, wherein the cannula is retracted in a direction away from the distal end of the stylet, and a discharged position, wherein the cannula is displaced from the charged position in the direction of the distal end of the stylet, a coil spring engaged between the stationary support and the guide for urging the guide toward the discharged position, **a manually operable charging member for moving the guide to the charged position against the urging of the coil spring,** and **a release means for retaining the guide in the charged position**.

('797 patent, col. 12, l. 54 - col. 13, l.5.)

> 2.   An apparatus for acquiring biopsy specimens, the apparatus comprising in combination:
>   a) **a biopsy actuator**;
>   b) a cannula having a predetermined inner diameter and having a distal end for insertion into a patient and having an opposing proximal end, **said proximal end having a first connector means secured thereto**;
>   c) a stylet means attached to the biopsy actuator, the stylet means having a predetermined outer diameter commensurate with the predetermined inner diameter of said cannula and adapted to slide into said cannula through the proximal end of said cannula, said stylet means having a distal end for closing the distal end of said cannula during insertion of said cannula into a patient, **said stylet means being detachable from said cannula**;

16

d) **said biopsy actuator comprising a second connector means for releasably and fixedly engaging the first connector means**, wherein the first connector means and the second connector means are movable as a unit during acquisition of the biopsy specimen,

e) said biopsy actuator comprising means for rapidly advancing the distal end of said cannula beyond the distal end of the stylet means to acquire a core biopsy specimen.

('798 patent, col. 14, l. 50 - col. 15, l. 8.)

### 1. "a cannula mount affixing the cannula to the guide"

Plaintiff proposes that this term should be construed to mean "anything that affixes or connects the cannula to the guide." MDTech's proposed construction is "a support which attaches the cutting cannula to the guide in a secured manner." At oral argument, counsel for MDTech agreed that the word "cutting," which Plaintiff found objectionable, could be removed from MDTech's proposed definition, and further agreed that "structure" could be substituted for "support" in the proposed definition. (Trans. at 92 - 93.)  The only real dispute between the two proposed constructions, therefore, is whether the "cannula mount" can be "anything," as Plaintiff proposes, or whether it must be a "support" or "structure," as MDTech argues it should.

A cannula mount, depicted as item **58** in the Fig. 1 embodiment, is shown to the right. The Fig. 1 embodiment depicts the cannula mount **58** configured to receive the cannula **66** at one end near its conical head **64** and to attach to the guide **18** at the other end by engaging the cannula mount's internal threaded portion **72** (the female thread) with the external threaded portion **56** (the male thread) of the guide **18**.  In other words, the cannula mount in this illustration joins the cannula to the guide by securing the cannula on one end and



17

having a screw-like connection with the guide on the other.

In the Fig. 5 embodiment shown to the right, the cannula mount **258** receives the cannula **266** on one end and plugs into the guide **218** by inserting the base **262** into a bore **255a** in the guide.  The specification explains that the cannula mount **258** is adhesively bonded within the bore **255a**.  ('797 patent, col. 9, 38 - 43.)



Plaintiff argues that both embodiments show the cannula mount joining the cannula and the guide and, therefore, that the mount can be "anything" that affixes these two components together.  In addition, Plaintiff argues that defining this term as requiring a support or structure is impermissibly interpreting it as means plus function claim.

MDTech, on the other hand, argues that the word "anything" gives too broad of a construction to this term, and that "anything" could include glue, velcro or other materials that can attach or affix components and that are not themselves structures.   MDTech argues that such a construction is in conflict with both the intrinsic and extrinsic sources to which the Court may refer.  First, MDTech points to language in the detailed description of the invention, explaining that "the proximal end **282** of the stylet **262** [sic] is adhesively bonded within the recess, and the base **262** of the cannula mount **258** is similarly secured within the bore **255a**." ('797 patent, col. 9, l. 40-43).  MDTech argues that, if the cannula mount can be secured with adhesive, the cannula mount itself cannot be adhesive and, therefore, it cannot be just "anything."

In addition, MDTech argues that the prosecution history reveals that this claim was amended to add the phrase "cannula mount" in order to obtain allowance of the claim.  Prior to the examiner's

18

amendment, the claim read, "a guide having means affixing the cannula thereto." (MDTech Claim Construction Brief, Doc. 54, Ex. 4, at GWB 00086.)  The examiner's amendment changed that language to its current form. (*Id.*, at GWB 00068.)  MDTech argues that the reason for the change was the submission of additional prior art references, one of which (the Portner patent) showed a guide directly gripping the cannula, as opposed to having a structure joining the two components. The change, MDTech argues, was meant to incorporate some structure that attached the guide to the cannula rather than having them directly attached or bonded together.  Plaintiff offers no alternative explanation for this amendment.

Finally, MDTech argues that a common dictionary definition of the noun "mount" is "FRAME, SUPPORT: as a material (cardboard) on which a picture is mounted." (MDTech Br., Ex. 6.); *see also* Mirriam-Webster Online Dictionary, *www.m-w.com* (same).  MDTech points out that this definition is consistent with the Fig. 1 and Fig. 5 embodiments, both of which refer to a support structure that attaches the cannula to the guide.

The Court agrees with MDTech that, based on the specification, prosecution history, and dictionary definition, "cannula mount" cannot simply mean "anything."  Rather, the Court concludes that this language contemplates and, thus, claims a piece or structure which is independent from the structures which are the guide and the cannula, and serves the function of connecting the two other structures.  Thus, the Court construes "a cannula mount affixing the cannula to the guide" to mean

"a structure or support which attaches or connects the cannula to the guide."[7]

> **2.** **"a manually operable charging member for moving the guide to the charged position against the urging of the coil spring"**

Plaintiff argues that this term should be construed to mean "a manually operable charging member or mechanism that is used to create a charge or stored energy, the charging member or mechanism configured to move the guide to the charged position against the urging of the coil spring." MDTech's proposed construction is "a charging member operable by means of the hand for moving the guide to the charged position against the urging of the coil spring." The parties' primary disagreement about this term's construction is based on Plaintiff's inclusion of the word "mechanism."[8] Indeed, both parties' proposed constructions add very little to the claim language, other than Plaintiff adding the word "mechanism" and MDTech making a point of excluding it.

In regards to this dispute, the detailed description of the invention in the patent describes the safety cap as the element that is retracted in order to move the guide against the spring, thereby compressing the spring and putting the device in the charged position. The dispute in this case is whether the safety cap or other structure that is used to move the device into the charged position can

---

[7]  The Court is not persuaded by Plaintiff's argument that defining this term as requiring a structure or support is the equivalent of improperly construing it as a means-plus-function claim. The Court is not holding that the structure or support must <u>only</u> be the structures identified in Fig. 1 and Fig. 5 as the cannula mounts (**58** and **258**), as would be the effect of a finding that it is a means-plus-function claim. The holding is merely that it must have some structure and cannot be just "anything."

[8]  In its brief and at the *Markman* hearing, Plaintiff also objected to MDTech's use of the phrase "operable by means of <u>the hand</u>," arguing that the term implies that the device can be operated by only one hand, which Plaintiff states is a possibility, but not a limitation. At the *Markman* hearing, counsel for MDTech clarified that MDTech was not seeking to impose a one-handed limitation, and, therefore, this is no longer a point of contention. Because the Court believes that "manually" does not require a definition, it includes "manually" and not "by means of the hand" in its construction of this term.

be described as a "mechanism."

MDTech objects to the inclusion of the word "mechanism" because, according to MDTech, "member" and "mechanism" are not interchangeable terms, and including "mechanism" improperly broadens the scope of the claim beyond the easy-to-use invention these patents describe.  MDTech points out that the word "mechanism" appears only twice in the specification and, in those instances, only to describe the more complicated prior art upon which the patent sought to improve.  ('797 patent, col. 1, l. 62-67 (describing prior art as disclosing "a complicated biasing mechanism") and col. 3, l. 8-12 (explaining that known biopsy instruments "incorporate biasing mechanisms which are either complicated in construction or require undue force to operate")).  In addition, MDTech argues that its position is supported by the dictionary definitions, which will be discussed below.

In support of its proposed construction, Plaintiff relies primarily on *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359 (Fed. Cir. 2002), in which the Federal Circuit held that the ordinary and customary meaning of the term "member" was not limited to a single component only but, instead, encompassed a multi-component structure.  Plaintiff argues that, although both the Fig. 1 and Fig. 5 embodiments describe a "charging member" by reference to the safety cap, the absence of a multi-component "charging member" in the specification should not be used to narrow the ordinary and customary meaning of the term "member."  In addition, counsel for Plaintiff argued at the *Markman* hearing that his argument was also supported by the fact that claim 5 of the '797 patent further defines the term "charging member" by including the following: "the charging member comprising a safety cap means for blocking inadvertent actuation of the release lever." ('797 patent, col. 12, l. 48-50.)  Counsel argued that, under the doctrine of claim differentiation, this definition supports his argument that the "charging member" as used in claim 7 could not be limited to just the

21

safety cap or otherwise just a single component.

The Court is not persuaded by Plaintiff's arguments and finds that the term "mechanism" is inconsistent with the common and ordinary meaning of "member" to someone skilled in the art, as well as with what is disclosed in the patent specification.  First, the Court finds that *CCS Fitness* does not support Plaintiff's proposed construction.  At issue in *CCS Fitness* was the term "reciprocating members" as used in patents for an elliptical trainer exercise device.  *CCS Fitness*, 288 F.3d at 1362.  In the patents at issue in that case, the drawings for the preferred embodiments showed the reciprocating members as single-component, straight bars that connected the pedals of the device to a shaft and crank system near the front of the machine, allowing the pedals to have a circular motion as the user pushes up and down on them.  *Id.* at 1362-63.  In that case, the accused infringing device contained a curved-bar with multiple components that served the same purpose of allowing the circular motion.  *Id.* at 1364.  In reversing the district court's construction of "member" as being limited only to a single-component structure, the Federal Circuit held that both the technical meaning and the ordinary and customary meaning of "member" encompassed a "beam-like structure that is 'a single unit in a larger whole.'" *Id.* at 1367.

As an initial matter, *CCS Fitness* involved a different patent and is, of course, not directly controlling in this case.  In addition, the term "mechanism" does not appear anywhere in the Federal Circuit's opinion in *CCS Fitness*.  Rather, the Court held that the term "member" encompassed a multi-component beam, lever, or structure.  Significantly, the Court consistently referred to the beam, lever, or structure in the <u>singular</u>, i.e., a single structure that has multiple components.  On the other hand, the term "mechanism" connotes a group of <u>independent</u> parts working together.  Indeed, "mechanism" is defined as "1 a: a piece of machinery **:** a structure of working parts functioning

22

together to produce an effect." Webster's Third New International Dictionary 1401 (1993); *see also* Mirriam-Webster Online Dictionary, *www.m-w.com* (defining "mechanism" as "1:a: a piece of machinery."). On the other hand, "member" is defined as "4: a constituent part of a whole, as . . . d(2): an essential part of a framed structure, a machine, or a device." Webster's Third New International Dictionary 1408 (1993); *see also* Mirriam-Webster Online Dictionary, *www.m-w.com*, (defining "member as "4: a part of a whole."). A mechanism, therefore, is not commonly understood to be simply a single part that has multiple components; a mechanism itself has multiple parts. Nor can "member" and "mechanism" be treated as synonymous, as Plaintiff seemingly attempts to do.

Based on the Court's reading of *CCS Fitness*, it concludes that the case does not support Plaintiff's proposed construction, and Plaintiff has not pointed to any other source that would support the interpretation of "member" as including the alternate meaning of "mechanism." Indeed, as MDTech argues, the specification actually counsels that, in defining "member," the Court should err on the side of simplicity rather than on the side of complexity. The only references to "mechanism" in the specification relate to prior art, are accompanied by the term "complicated," and are the very types of elements that Baran asserts he was attempting to remedy by making his invention more simple. Given that, and absent any other source to expand the meaning of "member" as it is used in claim 7, the Court cannot define "member" as including the alternate term "mechanism."

In addition, the argument Plaintiff raised at the *Markman* hearing based on the doctrine of claim differentiation does not convince the Court that it should add the words "or mechanism" to this claim language. According to Plaintiff, because claim 5 of the '797 patent further defines "charging member" as "comprising a safety cap means for blocking inadvertent actuation of the release lever," the term "charging member" in claim 7 cannot be limited to a single-component

23

structure.  Presumably, counsel for Plaintiff is contending that, because claim 5 employs the term

"comprising," claim 5 describes a charging member that includes a safety cap but is not limited to

just the safety cap.[9]  According to Plaintiff, then, defining the term "member" in this case as only a

single component renders the language in claim 5 further defining the "charging member" as

comprising more than one element superfluous.

As an initial matter, the defendant does not seek to limit the term member to a <u>single</u>

<u>component</u> structure.  At the hearing, counsel for MDTech said: "I'm not saying it has to be a single

part.  I mean, if it were two things welded together that moved in unison, I would consider that still

a member."  (Tr. at 89.)  Rather, MDTech simply argues that Plaintiff's effort to expand "member"

to include the far more complicated concept of a "mechanism" reaches too broadly, and effectively

rewrites the claim.

Even if the Court were to resort to the doctrine of claim differentiation, moreover, its

application would not compel the result Plaintiff espouses.  Although claim differentiation can apply

outside of the independent/dependent claim scenario, the Federal Circuit has "observe[d] that two

considerations generally govern this claim construction tool when applied to two independent claims:

(1) claim differentiation takes on relevance in the context of a claim construction that would render

additional, or different, language in another independent claim superfluous; and (2) claim

differentiation 'can not broaden claims beyond their correct scope.'" *Curtiss-Wright Flow Control*

---

[9] "'Comprising' is a term of art used in claim language which means that the named
elements are essential, but other elements may be added and still form a construct within the
scope of the claim." *Genentech, Inc. v. Chiron Corp.*, 112 F.3d 495, 501 (Fed. Cir. 1997).  The
term "comprising" is contrasted with the term "consisting of" in general principles of claim
construction.  "Consisting of" generally is interpreted as including the subsequent elements
listed, but no more and no less.

*Corp. v. Velan, Inc.*, 438 F.3d 1374, 1381 (Fed. Cir. 2006) (*citing Fantasy Sports Props v. Sportsline.com*, 287 F.3d 1108, 1115-16 (Fed. Cir. 2002)).  The Federal Circuit has characterized this doctrine more generally as "the presumption that each claim in a patent has a different scope." *Id.* at 1380 (*quoting Versa Corp. v. Ag-Bag Int'l Ltd.*, 392 F.3d 1325, 1330 (Fed. Cir. 2004)).  Further, the Court has described claim differentiation as a "narrow tool of claim construction." *Id.* at 1378.

In this case, the doctrine of claim differentiation simply does not compel the result Plaintiff espouses.  Even if this Court construed "charging member" in claim 7 as including only a single component, it would not render the language in claim 5 superfluous.  In that instance, such a construction would not limit the charging member in claim 7 to a component that includes a safety cap (the single component could be some other structure or part), even though claim 5 <u>does</u> require such a cap.  As such, the language in claim 5 would not be superfluous.  This Court, therefore, does not find that claim differentiation effects its analysis of this disputed language.

The Court notes, however, that, in finding that "member" does not encompass "mechanism," it only determines what "member" is <u>not</u>; it does not determine how it should be defined.  For their part, the parties offer little guidance and, indeed, do not even attempt to define member.[10]  Given that the parties do not seek to define "member," and that their sole dispute over this term is whether it

---

[10]  As noted at the *Markman* hearing:

THE COURT:  But, you don't even seek to define member, really, other than – what you seek to define is manually.

MS. THOMPSON (counsel for MDTech):   No, I seek to define member only insofar as to exclude the expansion that Plaintiffs put on it.

(Tr. at 88.)

could be defined to include "mechanism," the Court sees no need to further define this term. Accordingly, the Court construes "a manually operable charging member for moving the guide to the charged position against the urging of the coil spring" pursuant to Plaintiff's proposed construction, absent the term "mechanism," as follows:  "a manually operable charging member that is used to create a charge or stored energy, the charging member configured to move the guide to the charged position against the urging of the coil spring."

### 3. "a release means for retaining the guide in the charged position"

The parties agree that this term should be construed as a means-plus-function claim limitation in accordance with Section 112, ¶ 6.  As discussed above, construction of a means-plus-function claim involves a two-step process.  First, the Court must identify the recited function that the "means" performs.  *Omega Eng'g, Inc.*, 334 F.3d at 1321.  Next, the Court must identify the corresponding structure that performs the recited function.  *Id.*

### a. Recited Function

In defining the recited function, MDTech argues that the word "release" preceding the means language must be considered and, therefore, the stated function is the means for retaining the guide in the charged position <u>and</u> releasing the guide from the charged position.  In support of its argument, MDTech argues that every word in a claim must be given meaning, and that "release" cannot simply be ignored.  This principle must be followed here, according to MDTech, even though a clear function follows the term "means for" and even though the term "release" precedes the means language in this term.  In support of its argument, MDTech cites *Cannon Rubber Ltd. v. The First Years Inc.*, 2004 WL 2095669 (N.D. Ill. Sept. 17, 2004), which will be discussed below.

Plaintiff argues that the function to be performed should only include the phrase following

26

the word "for," i.e., that the function should be defined as "retaining the guide in the charged position."  Plaintiff contends that when a function is expressly stated in a claim, it is impermissible to adopt a different function than the one stated.  Further, Plaintiff argues that requiring the release function as well as the retention function here essentially would be importing limitations from the specification into the claim, which is also impermissible.  According to Plaintiff, the word "release" is best understood in this claim as requiring that the retaining means element be releasable - i.e., that the structure performing the retaining function can subsequently be released.

The Court begins its analysis by looking to *Cannon Rubber*, a district court case upon which MDTech primarily relies.  The patent at issue in *Cannon Rubber* disclosed a handheld breast pump for nursing mothers, and the district court was faced with the construction of the term "valve means mounted in the body for cyclically releasing the negative pressure which is generated in the inlet." *Id.* at *2.  In that case, the patent specification described the valve as serving two roles: when the handle to the pump was squeezed, the valve helped form a seal between the upper part of the pump and the milk-collecting vessel to maintain negative pressure within the upper part of the pump, thus causing the user to lactate; when the handle was released, the valve broke its seal, leaving an aperture so that the milk could flow through to the milk-collecting vessel below.  *Id.*

Regarding the stated function of the disputed claim term, the plaintiff in that case argued that the word "valve" preceding the means language should be disregarded in defining the recited function.  *Id.* at *4.  The court rejected the plaintiff's various arguments for disregarding that term, explaining that "[i]t is well established that each word in a claim must have meaning."  *Id.* (*citing Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 93 F.3d 1572, 1582 (Fed. Cir. 1996)).  The court then looked at the common and ordinary meaning of the word "valve," finding that the term meant

27

"any of numerous mechanical devices by which the flow of liquid, air . . . may be started, stopped, or regulated by a moveable part that opens, shuts, or partially obstructs one or more ports or passageways." *Id*. at *6.  Based on that definition, the court defined the function of the claim term as "cyclically releasing the negative pressure which is generated in the inlet <u>and</u> regulating the flow of air through a passageway by opening, closing or obstructing the passageway." *Id.* (emphasis added.)

Applying the reasoning of *Cannon Rubber* to the instant case, MDTech argues that this Court should read the term "release" as informing the definition of the recited function, such that the function should be both retaining <u>and</u> releasing the  guide.  In response, Plaintiff takes issue with MDTech's reliance on *Cannon Rubber*, arguing at the *Markman* hearing that "the term valve was given ordinary and customary meaning, [it] wasn't interpreted [as] part of [a Section] 112, paragraph 6 analysis.  And the Court did not look to the specification to identify the specific functioning of the valve." (Tr. at 60.)

First, the Court disagrees with Plaintiff's counsel's interpretation of *Cannon Rubber*.  The court in that case clearly interpreted the term "valve" as part of its Section 112, ¶ 6 analysis, as evidenced by the fact that it first defined the recited function as being <u>both</u> the cyclical releasing of negative pressure <u>and</u> the regulating of the flow of air by opening, closing, and obstructing, then identifying the corresponding structures that performed both of those functions.  The court specifically noted, after examining the specification and identifying multiple structures that perform the recited functions, that the term "'valve means' comprises a combination of structural components working together to complete the pressure cycle." *Id.* at *8.

One facial difference between *Cannon Rubber* and the present case is that Plaintiff in this

28

case, unlike the plaintiff in *Cannon Rubber*, does not ask the Court to disregard "release;" rather he argues that "release" does have meaning, and that it is best understood as meaning that the retaining means is releasable.  The Court, however, does not find that to be a tenable interpretation.  Had the patent drafter sought to convey a releasable retaining means, the drafter would have simply used the word "releasable" rather than "release."  Viewing "release" to mean "releasable" in this context is simply too much of a stretch.  Having failed to propose a tenable meaning of the term "release," therefore, Plaintiff is in a similar position in this case to the plaintiff in *Cannon Rubber*:  Plaintiff essentially asks the Court to ignore the term "release."

This Court, like the court in *Cannon Rubber*, is faced with a means-plus-function clause that has a very clearly defined function ("for retaining the guide in the charged position") with prefatory language ("release") that, if used to inform the recited function, would suggest a different or additional function.  This situation appears to present a conflict between two rules of claim construction.  On one hand, to use the term "release" to inform the definition of the function arguably "impermissibly limit[s] the claim by adopting a function different from that explicitly recited," *Generation II Orthotics, Inc. v. Med. Tech., Inc.*, 263 F.3d 1356, 1364-65 (Fed. Cir. 2001); on the other hand, to ignore the term "release" would run afoul of the rule that "[w]e must give meaning to all words in [the] claims," *Exxon Chemical Patents, Inc. v. Lubrizol Corp.*, 64 F.3d 1553, 1557 (Fed. Cir. 1995), and, similarly, that "claim limitations defining the subject matter of the invention are never disregarded," *In re Sabatino*, 480 F.2d 911, 913 (CCPA 1973).

In *Cannon Rubber*, the court resolved this conflict with the statement that, "[e]ven where, as here, clearly functional language follows the word 'for,' the prefatory claim language preceding the word 'means' serves to at least partially identify the function of the recited means."  *Cannon*

*Rubber*, at \*5.  As support for that proposition, the court cited *Sage Products, Inc. v. Devon Industries, Inc.*, 126 F.3d 1420, 1427-28 (Fed. Cir. 1997).  This Court's review of *Sage Products*, however, does not support that proposition.  First, the Court in *Sage Products* did not identify this particular problem.  In addition, in that case, although the Federal Circuit did require the recited means to perform two functions, the source for both of those functions, although contained in the prefatory language, also <u>followed</u> the means language in those claims or was defined in language that followed.  *Sage Prods., Inc.*, 126 F.3d at 1427-48 (holding that the limitation "closure means . . . for controlling access" requires the means to perform the functions of "closing the slot means" and "controlling access to the slot means," where the claim itself describes that "closure means" as being "capable of moving to close access to said slot means.")  In the least, there is a much weaker basis in this case than in *Sage Products* to read "release" into the stated function.

The Court, nonetheless, finds that it must give meaning to the term "release" in this claim.  Absent another tenable interpretation, which has not been offered, the Court must assume that the patent drafter included this term for a reason.  In this case, the only possible meaning the term "release" has in this claim is to better inform the function that the means must perform.

Interestingly, one of the definitions of "release" in its noun form includes both the retention and releasing function.  Mirriam-Webster Online Dictionary, *www.m-w.com* ("6: a device adapted to <u>hold or release</u> a mechanism as required." )(emphasis added).  In its verb form, it is defined as "1: to set free from restraint, confinement, or servitude."  *Id.*  As such, the Court identifies the function of this means-plus-function claim as "retaining the guide in the charged position and releasing, or

setting free, the guide from the charged position."[11]

### b.    Corresponding Structure

The next step in a means-plus-function limitation is identifying the structure in the specification that corresponds to the recited function.  A structure is corresponding "only if the specification or the prosecution history clearly links or associates that structure to the function recited in the claim." *Omega Eng'g, Inc.*, 334 F.3d at 1321 (*quoting B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997)).  In this case, the '797 patent's detailed description of the invention explains the retention and the release of the spring guide as follows.  As for the retaining function, the patent provides that, to convert the instrument from the discharged mode to the charged mode, "[t]he safety cap **20** and the spring guide **18** are retracted in this manner until the latching projection **102** on the release lever **22** engages in the annular external shoulder **54** of the spring guide." ('797 patent, col. 7, l. 23-27.)  Fig. 4A below shows the release lever **22** and latching projection **102** as they appear in the discharged mode.

---

[11]  Contrary to Plaintiff's argument, the identification of this function does not improperly import a limitation from the specification; it looks only to the ordinary and common meaning of "release," a term which the patentee chose to write into the claim.

Similarly, in the single use embodiment, the patent states that conversion to the charged mode requires that "the latching projection **302** of the release lever **222** engages the external shoulder of the biopsy spring guide **218**." (*Id.*, col. 10, l. 5-7.)

As for the releasing function, the patent explains that "the operator . . . actuates the instrument by depressing the finger rest **96** of the release lever **22**, which is flexibly welded to the outer casing **12** as described hereinabove. Manipulation of the release lever raises the latching projection **102**, disengaging it from the external shoulder **54** of the spring guide **18**." ('*Id.*, col. 7, l. 61-67.) The single use embodiment is used "in precisely the same procedure" as the reusable embodiment. (*Id.*, col. 10, l. 14-16.)



FIG. 4A

32

In turn, as shown to the right in a portion taken from Fig. 2, "[t]he release lever **22** comprises a finger rest **96** and a mounting section **98** maintained in spaced parallel planes by a connecting web **100** . . . Mounting section **98** is formed with a latching projection **102** at one end of the release lever and is flexibly secured to the outer casing with a spot weld **104**." (*Id.*, col. 6, l. 25-32).

Likewise, the single use embodiment contains substantially similar features (with different corresponding numbers), as shown to the right in a portion of the illustration taken from Fig. 8. The description provides that "[t]he mounting section **298** of the release lever **222** is flexibly solvent-bonded to the outer casing at **304**. (*Id.*, col. 9, l. 36-37.)



Based on the specification described above, the Court finds that the structures corresponding to the recited functions in this means-plus-function limitation are the following: (1) for the reusable embodiment (Figs. 1 - 4A), the release lever **22**, including the latching projection **102**, the finger rest **96**, and mounting section **98**, as well as the equivalents thereof; and (2) for the single use embodiment (Figs. 5- 8A), the release lever **222**, including the latching projection **302**, the finger rest (not marked by a reference numeral), and the mounting section **298**, as well as the equivalents thereof. All of these structures and their elements are specifically linked to the stated functions of retaining and releasing the spring guide, either in the description of the operation of the instrument or the detailed description of the structures themselves. As such, they are appropriately determined to be corresponding structures.



### 4. "biopsy actuator"

33

Turning to the other patent in suit, the '798 patent, the first disputed term of claim 2 (the only asserted claim) is "biopsy actuator."  Plaintiff's proposed construction is "a mechanism for the removal of tissue."  MDTech proposes that this term be defined to mean "the automated biopsy instrument **10** having an outer casing **12**; an inner support rod **14**; a coil spring **16**; a biopsy spring guide **18**; a safety cap **20**; a release lever **22**; and a needle **24**, as shown in Figure 1."  In essence, MDTech's proposed construction defines the "biopsy actuator" as the "automated biopsy instrument"- i.e., the claimed invention.

In support of its proposed definition, MDTech relies solely on the prosecution history. According to the prosecution history, the examiner initially rejected claim 2 (originally claim 8 in the application)  as being indefinite because it read "a biopsy actuator . . . <u>further</u> comprising . . .," even though the "biopsy actuator" itself had not been defined as having any structure.  (Ex. 5 to MDTech's Br., GWB00609) (emphasis added).  In response, the applicant amended the patent application by deleting "further" from the claim.  (*Id.* at GWB00600.)  MDTech seizes upon comments made in the remarks to this amendment where the applicant describes the invention as "comprising a cannula **66** and a <u>biopsy actuator **10**</u>."  (*Id.* at GWB00606) (emphasis added).  In the specification of the '798 patent, however, reference numeral **10** refers to the "automated biopsy instrument" generally.  ('798 patent, col. 5, l. 29-32.)   The automated instrument **10** is further described as having the "seven principle elements" that MDTech seeks to use to define the "biopsy actuator."

At the *Markman* hearing, counsel for MDTech argued that the applicant used reference numeral **10** to refer to the biopsy actuator in order to overcome the examiner's finding that the claim was indefinite as originally drafted.  In doing so, MDTech argues that the patentee acted as his own

34

lexicographer and defined "biopsy actuator" as "biopsy instrument," thereby incorporating all of the elements of the biopsy instrument.

As an initial matter, it is clear that MDTech's interpretation of the prosecution history is inaccurate.  The applicant did not refer to the biopsy actuator using reference numeral **10** in <u>response</u> to the examiner's assertion that the claim was indefinite; he made that reference in the remarks section of the filing when he was providing a general description of the invention.  The only mention of claim 8 (which ultimately became claim 2) in the amendment and response section was to indicate that "further" was deleted.  MDTech is attempting to extrapolate a comment made in the remarks section and attribute a motivation for making that comment which is simply not there.  For that reason, its interpretation must be rejected.

While the Plaintiff argues that the reference to numeral **10** in the remarks was just a mistake by the prosecuting attorney and should not be given any significance, this Court does not need to determine whether it should be characterized as a mistake, because the claim and the specification provide enough guidance for construing this term.  MDTech's proposed interpretation is inconsistent with the claim and the specification and, therefore, regardless of whether the prosecuting attorney made a mistake or not, the one paragraph of the prosecution history upon which MDTech relies is given little weight compared to the rest of the intrinsic evidence that guides this Court.

It is also clear that Plaintiff's proposed definition - "a mechanism for the removal of tissue" - is too broad and essentially repeats the introductory phrase of claim 2, which is "[a]n apparatus for acquiring biopsy specimens."  Plaintiff also points out that "biopsy actuator" is further defined  in claim 2 under subparts d) and e), which provide:

d)      said biopsy actuator comprising a second connector means for releasably and fixedly

35

engaging the first connector means, wherein the first connector means and the second connector means are movable as a unit during acquisition of the biopsy specimen,

e)      said biopsy actuator comprising means for rapidly advancing the distal end of said cannula beyond the distal end of the stylet means to acquire a core biopsy specimen.

('798 patent, col. 14, l. 67 - col. 15, l. 8.)  According to the claim language, therefore, the "biopsy actuator" includes at least a second connector means and a means for rapidly advancing the cannula. In addition, the Summary of the Invention section of the '798 patent describes the invention as "comprising a cannula and a biopsy actuator," (*Id.* at col 3, l. 43-44), and further explains that the biopsy actuator includes a stylet means, (*Id.* at col. 3, l. 47-50), a second connector, (*Id.* at col. 3, l. 58-63), a means for exposing the notch of the stylet and subsequently advancing the cannula over that notch, (*Id.* at col. 3, l. 64-67), and, in some aspects of the invention, a means for retracting the second connector (*Id.* at col. 4, l. 5-10) and for rapidly advancing the cannula (*Id.* at col. 4, l. 16-19). Further, the Detailed Description of the Invention indicates that an operator of the biopsy instrument "<u>actuates</u> the instrument by depressing the finger rest **96** on the release lever **22**," which raises the latching projection such that "the stored energy of the biasing means or compressed coil spring **16** is released to drive the cannula **66** forward over the stationery stylet **60** and into the mass."  (*Id.* at col. 8, l. 48-58) (emphasis added).

According to the claim and the specification, therefore, the "biopsy actuator," in descriptive terms and in the words of Plaintiff's counsel, constitutes the subparts of the biopsy instrument that make the instrument an automated rather than a manually operated device.  (Tr. at 63).  Although there is little in the specification that limits the biopsy actuator to something less than the entire biopsy instrument, it must be something more limited than the "apparatus" referred to in the introductory language to claim 2, and it at least does *not* include the cannula.

36

Based on the claim language and the specification, therefore, the Court defines "biopsy actuator" as "<u>a mechanism for putting the biopsy instrument in operating motion, other than by hand</u>."[12]  This construction is also consistent with the ordinary meaning of "actuator," which is defined as "one that actuates; *specifically* : a mechanical device for moving or controlling something."  Mirriam-Webster Online Dictionary, *www.m-w.com*; *see also* Webster's Third New International Dictionary 22 (1993) ("one that actuates; *specif* : any of various . . . mechanisms by means of which something is moved or controlled indirectly instead of by hand.")

### 5.    "said stylet means being detachable from said cannula"

The Court addresses this term out of order because construction of this term aids the discussion of the remaining terms.  The dispute as it relates to this term is over the word "detachable."  Plaintiff's proposed construction is "the stylet is capable of being decoupled or disassembled from the cannula."  MDTech's proposed construction is "the thin wire with a sharpened point is capable of being separated or withdrawn from the cutting cannula without loss or damage."  At oral argument, counsel for MDTech agreed that "stylet" or "slender probe"[13] could be substituted for "thin wire with a sharpened point" and that "cutting" could be removed before cannula.  (Tr. at 109.)  The issue, therefore, is whether "detachable" requires that separation occur

_____

[12]  The Court rejects MDTech's belated argument, made for the first time at the close of the *Markman* hearing, that this definition would render the term "biopsy actuator" indefinite. The Court finds that the additional limitations placed on this term elsewhere in claim 2, where the term is first used, suffice, as construed by this Court, to provide a sufficiently definite structure to the actuating mechanism claimed.

[13]  Plaintiff contends that the parties agreed to a stipulation that "stylet" would be defined as "slender probe." Counsel for MDTech did not remember that stipulation, however, and Plaintiff used "stylet" instead of "slender probe" in its proposed construction.  As it does not appear to be a point of contention, the Court does not define "stylet" for purposes of this claim construction.

37

"without loss or damage."

In support of its argument that being "detachable" requires separation without loss or damage, MDTech relies on various case law, the specification of the '798 patent, and the dictionary definition of "detachable."  The case on which MDTech primarily relies is *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356 (Fed. Cir. 1999), in which the Federal Circuit addressed the meaning of the term "permanently affixed" as used in a patent claim describing how an in-line roller skate base was connected to the boot.  *Id.* at 1360-61.  The asserted claim in that case contained the limitation that the boot be "permanently affixed" to the base, and the issue before the Court was whether a removable screw used in the accused device met the "permanently affixed" limitation.  *Id.*  In defining "permanently affixed," the Court first considered that the patentee distinguished prior art that included a "detachable" boot, noting that the term "permanently" was added to distinguish claims from the "detachable" boot disclosed in the prior art.  *Id.* at 1364.  The Court then addressed the difference between a permanent and a removable connection, first considering what it considered a permanent rivet-made connection and a permanent single injection molded unit, and stating that:

> Likewise, were an adhesive laminate used to provide the permanent connection, that permanence too could be destroyed by breaking the structure apart.  Screws, unlike rivets and laminates, are meant to be unscrewed, that is, to be removed.  A rivet or a laminate, to the contrary, is meant to remain permanent, unremovable unless one is bent on breaking the permanent structure apart.

*Id.* at 1365 (citations to the record omitted).  In affirming the district court's holding that "permanently affixed" required an unremovable connection, the Federal Circuit found that the removable screw in the accused device did not meet the limitation of the asserted claim and, thus, there was no literal infringement.  *Id.* at 1365-66.

In this case, MDTech argues that the patentee focused on the "detachable" quality of the

38

stylet and cannula in the reusable embodiment (depicted in Fig. 1), as contrasted with the permanently affixed quality of the stylet and cannula in the single use embodiment (depicted in Fig. 5).  MDTech points to the fact that the specification describes the stylet of the reusable embodiment as being "detachably engaged" within the clevis **46** of the spring guide **18**, but does not use the term "detachable" in relation to the stylet of the single use embodiment. ('798 patent, col. 7, l. 41-43.)[14] Indeed, the single use embodiment is described as being assembled like the reusable embodiment, except that the stylet in the single use embodiment is "adhesively bonded" within the recess, and the cannula mount is "similarly secured" (i.e., with adhesive) within the bore.  (*Id.*, col. 10, l. 24-27.) In addition to these arguments, MDTech also relies on a dictionary that defines "detachable" as "to separate especially from a larger mass and usually without violence or damage."

On the other hand, Plaintiff argues that MDTech's proposed construction is improper because there is nothing in the claim or specification that requires the limitation of "without loss or damage." Plaintiff points out that the specification, in describing the assembly of the instrument, explains that the stylet is telescopically or coaxially received within the cannula to form the needle in both the reusable and single use embodiments.  ('798 patent, col. 7, l. 36-37; col. 10, l. 22-23.)  Presumably, this reference indicates that, at some point, the stylet and cannula are separate and, therefore, detachable.  Plaintiff argues that the claim does not specify <u>when</u> the stylet is capable of being decoupled or disassembled from the cannula, and that detachability does not occur during the normal operation of the instrument, but during the assembly or disassembly of the instrument.  Plaintiff, however, does not address how they would be detached during disassembly.   Finally, Plaintiff

_____

[14]  For the sake of clarity, the Court notes that the specification refers to the clevis **46** of the spring guide **18**, but Fig. 1 appears to indicate that the clevis **46** is on the inner support rod **14**, not the spring guide **18**.

argues that there are dictionary definitions of "detachable" that do not include the words "without violence or damage," and that MDTech has selectively chosen a dictionary solely to support its proposed construction.[15]

After considering the parties' arguments, the Court concludes that MDTech has the better argument and that the term "detachable" as used in this claim requires separation "without loss or damage." The Court finds it significant that the specification only describes the stylet of the reusable embodiment as being "detachably engaged" within the clevis of the spring guide, ('798 patent, col. 7, l. 41-43), but specifically distinguishes the assembly of the single use embodiment by describing that the stylet is "adhesively bonded" within the recess of the base. (*Id.*, col. 10, l. 24-27.) The term "detachable" does not appear at all in the portion of the specification describing the single use embodiment. Further, "detachably" also appears in the specification in describing that the cannula mount is "detachably affixed" to the spring guide in the reusable embodiment, a connection that, in Fig. 1, is made by use of a screw thread, not a plug in or adhesively bonded connection.[16] The specification, therefore, refers to a piece being "detachably engaged" or "detachably affixed" where

---

[15] Plaintiff also contends that MDTech misses the point by focusing on how the stylet is secured to the spring guide and how the cannula is secured to the cannula mount, because this claim focuses on the stylet's relation to the cannula, not to the other parts of the instrument. The Court is not persuaded by this argument. As MDTech put it, "[i]t will be appreciated that if the cannula and stylet are secured by adhesive, the stylet is not detachable from the cannula except upon the occurrence of 'violence or damage.'" (MDTech Br. at 21.) The stylet and the cannula need not be bonded to each other to conclude that the patentee did not intend them to be "detachable," it is enough that they are bonded to the instrument when the stylet is received within the cannula.

[16] The Court understands that the cannula mount being detachable from the spring guide is a separate feature than the stylet being detachable from the cannula; it only notes the use of the term "detachably" in that context to explore the patentee's understanding of that word's meaning as used in the '798 patent.

the piece is placed in the clevis or where a piece is connected by a screw thread; but it does not use that term when pieces are adhesively bonded or similarly secured. This distinction suggests that the patentee intended "detachable" to mean capable of removal or separation without breaking or causing damage through the necessary use of undue force.

This conclusion is further supported by the dictionary definition of "detachable," which is: "capable of being or designed to be detached **:** capable of being separated or withdrawn <u>without loss or damage</u>." Webster's Third New International Dictionary 615 (1993) (emphasis added); *see also* Mirriam-Webster Online Dictionary, *www.m-w.com* (not defining "detachable" separately, but defining "detach" as "**1:** to separate especially from a larger mass and <u>usually without violence or damage</u>." (emphasis added)). Because the Court has relied on the same dictionaries throughout this opinion, Plaintiff's argument that MDTech has selectively used dictionaries to support its construction of this term is unavailing.

In addition, the Court notes that, although the Federal Circuit's decision in *K-2* is, again, not <u>directly</u> controlling on this issue because it involved a different patent, specification, and prosecution history (especially prior art distinctions that are not present in this case), it nonetheless reflects a similar understanding of the general concepts of detachability and permanent affixation. Although this Court's conclusion is based on the claim language and specification of the '798 patent specifically, it is at least consistent with the notion espoused in *K-2* that something is not detachable or removable if doing so requires breaking the permanent structure apart.

For the reasons stated above, therefore, the Court construes this term to be "<u>the stylet is capable of being separated or withdrawn from the cannula without loss or damage.</u>"

In so holding, the Court recognizes that this construction may exclude claim 2's coverage of

41

the single use embodiment of the invention illustrated in Fig. 5.  Indeed, this is a consistent area of dispute between the parties and, although it arises primarily in connection with the term "releasably engaging" (addressed next), this issue is also implicated by interpretation of the term "detachable." MDTech argues that claim 2 of the '798 patent was written only to cover the reusable embodiment of the invention, not the single use embodiment.  Specifically, MDTech contends that the use of the words "detachable" and "releasably engaging" in claim 2 demonstrates that the drafter intended this claim to cover only the reusable embodiment.  According to MDTech, because the stylet and/or the cannula of the single use embodiment can be adhesively bonded or otherwise secured to the instrument, and because the cannula mount in that embodiment is connected to the spring guide with a peg and hole or adhesive connection, those pieces must be broken or subjected to undue force in order to detach or release them.  MDTech argues that one skilled in the art would not understand "detachable" or "releasable" to require a user to damage or break the items in order to accomplish that task and, thus, that claim 2 is not written toward the single use embodiment.

Plaintiff counters by arguing that there is nothing in the patent that indicates that the patentee intended to give up an entire alternative embodiment when he drafted these claims, and that it would be improper to construe these claims in such a way that could produce that result.  Specifically regarding the second connector means "releasably engaging" the first connector means, Plaintiff acknowledges that "the addition of an adhesive does create more of a bond," but that something adhesively bonded nonetheless can be pulled out.  (Tr. at 72.)  In addition, Plaintiff points out that all but one of the independent claims of the '798 patent (claim 18) use the term "releasably."  As such, construing "releasably" as not covering the single use embodiment excludes all but one claim from covering that embodiment.

42

The Court agrees with MDTech that it is possible that claim 2 may not cover the single use embodiment and, even if the court's construction of "detachable" and "releasably engaging" produce that result, such a construction, though not the norm, is not improper.  In describing the reusable embodiment, the specification clearly provides that "[b]ecause the cannula mount **58** is detachably affixed to the spring guide **18**, the biopsy instrument **10** may interchangeably employ a needle having any one of several configurations well known in the art . . ." ('798 patent, col. 6, l. 46-53) (emphasis added).  Although the single use embodiment can employ several needle configurations, it cannot do so interchangeably, a feature of the single use embodiment which is attributed to the fact that the cannula mount is detachably affixed to the spring guide.  The specification does not contain similar language in connection with the single use embodiment.

In addition, contrary to Plaintiff's assertion, each claim of a patent does not have to cover every embodiment in the patent.  *See Ventana Med. Sys. v. Biogenex Labs., Inc.*, 473 F.3d 1173, 1181-82 (Fed. Cir. 2006) ("[E]ach claim does not necessarily cover every feature disclosed in the specification").  In this case, claim 18 of the '798 patent does not include the terms "detachable" or "releasably engaging" and, therefore, the Court's construction would not exclude claim 18's coverage of the single use embodiment.  In addition, as MDTech points out, '798 is a continuation-in-part and does not have to cover everything that has already been covered by the '797 patent.  Indeed, none of the claims of the '797 patent contain  "detachable," "releasably," or comparable terms and, therefore, would not exclude the single use embodiment.  For that reason, the Court need not construe claim 2 to cover both the reusable and single use embodiments.

In addition, Plaintiff's remaining arguments are not persuasive.  Plaintiff argues that the specification of the '798 patent explains that both embodiments have essentially the same operation

43

with only small differences.  ('798 patent, col. 9, l. 41-60.)  ("[T]he principles of operation [of the reusable and single use embodiments] are virtually identical.")  Plaintiff contends that this implies that both embodiments function in a "releasably engaging" manner.  As noted above, the specification also expressly states that the reusable embodiment can interchangeably employ various needle sets because the cannula mount of that embodiment is "detachably affixed" to the spring guide, a feature that is not disclosed in relation to the single use embodiment.  In addition, while the specification may state that both embodiments have essentially the same operation, it also explains that:

> Assembly of instrument **210** [the single use embodiment] is quite similar to assembly of instrument **10** [the reusable embodiment], as described hereinabove.  However, in this instance, the proximal end **282** of the stylet **26[6]** is adhesively bonded within the recess **246**, and the base **262** of the cannula mount **258** is similarly secured within the bore **255a**.

(*Id.*, col. 10, l. 22-27) (emphasis added.)  In addition, while the cannula of the reusable embodiment is described as being secured "in any suitable manner," (*Id.*, col. 6, l. 35-37), the specification describes that the cannula of the single use embodiment "may there be secured by means of adhesive (not shown)."  (*Id.*, col. 10, l. 14-15.)  These distinctions are crucial, and they may well remove the single use embodiment from the coverage of a claim that describes an instrument with a "detachable" stylet or a cannula mount that is "releasably engaging" with the spring guide.

Finally, Plaintiff's cite to *Micro Chemical, Inc. v. Great Plains Chemical Co., Inc.*, 194 F.3d 1250 (Fed. Cir. 1999) is unavailing.  In that case, the Federal Circuit explained that "[w]hen multiple embodiments in the specification correspond to the claimed function, proper application of § 112, ¶ 6 generally reads the claim element to embrace each of those embodiments."  *Id.* at 1258.  This cite, however, does not support Plaintiff's argument because it relates specifically to a means-plus-

44

function analysis, namely a court's identification of structures in the specification that correspond to a recited function.  Here, the Court is not identifying structures that correspond to the recited function in a means-plus-function clause, it is using ordinary claim construction principles to interpret a claim term, even though its construction may exclude that claim's coverage of an alternative embodiment.

The Court, therefore, is not persuaded that it must give these disputed terms a construction that results in claim 2 covering the single use embodiment.

### 6.    "said biopsy actuator comprising a second connector means for releasably and fixedly engaging the first connector means"

The Court also addresses this disputed term out of order because, as will be discussed below, interpretation of this term affects the interpretation of "first connector means," addressed next.  The primary dispute as it relates to this term is whether it must be construed as a means-plus-function clause or whether it should be interpreted according to the standard rules of claim construction. MDTech argues that this term should be interpreted as a means-plus-function limitation, and that the corresponding structure is the quarter turn male thread **56** of the spring guide **18**.[17]  Plaintiff argues that ordinary principles of claim construction apply, and that this term should be defined as "the biopsy actuator comprising a second connector, which is anything that connects, the second connector being capable of being releasably and fixedly engaged with the first connector."

The first question the Court must resolve is whether the use of the term "connector" recites sufficient structure for performing the recited function to overcome the presumption that the drafter intended to invoke Section 112, ¶ 6, a presumption triggered by the use of the word "means".  *See*

---

[17]    Because MDTech argues that claim 2 covers only the reusable embodiment of the invention, it only identifies structures that correspond to the structures of Fig. 1, not Fig. 5.  Put another way, it argues that no structure in Fig. 5 performs the recited function.

*Rodime*, 174 F.3d at 1302.  MDTech argues that a person of ordinary skill in the art would not have understood "connector" to perform <u>both</u> the functions of releasably <u>and</u> fixedly engaging; specifically, MDTech contends that "connector" is commonly understood as only performing the function of engaging or joining, not releasing.  According to MDTech, absent evidence that the patentee intended to act as his own lexicographer and define connector as also performing a releasable function, the term "connector" does not recite sufficient structure to perform the recited functions and this clause must be given a means-plus-function limitation.

Plaintiff argues that the term "connector" is commonly understood as a structure that is inherently capable of releasably and fixedly engaging another mating connector.  Plaintiff gives examples in the field of medicine that include mechanical connectors (for fluid transfer), electrical connectors (for monitoring vital signs), and computer connectors (for imaging equipment).  Plaintiff contends that, in those examples, the connectors are capable of being removed or released after they have been fixedly engaged with the other connector.

The problem with both of the parties' positions regarding this term is that they are too extreme.  MDTech essentially argues that <u>no</u> connectors are capable of being released after they engage another connector (i.e., that all connectors form permanent connections), and Plaintiff argues that <u>all</u> connectors are capable of being released.  If the Court accepted MDTech's proposed construction, then this claim would be limited only to the precise structure in Fig. 1 - the quarter turn male thread on the spring guide - that performs this function in that one embodiment.  That construction is too narrow. While it is true that some connectors may form a permanent connection and cannot be released, there are many aside from the screw-in cannula mount depicted in Fig. 1 that are capable of being released.  For example, at the *Markman* hearing, the Court suggested that a

46

hooking mechanism would operate as a connector that both fixedly engages and is releasable.  (Tr. at 104.)  MDTech's construction is improperly limiting.

The relevant dictionary definition of "connector" is "**2:** something that connects: as **a:** a flexible tube for connecting the ends of tubes **b:** a railroad coupling **c: (1):** a device for detachably connecting flexible electrical conductors together . . ."  Webster's Third New International Dictionary 481 (1993).  In turn, "connect" is defined as "**1:** to join, fasten, or link together usually by means of something intervening."  *Id*. at 480.  The examples of connectors provided in the dictionary definition, as well as those offered by Plaintiff, all describe a connector that can be later released.  Indeed, one of the definitions included the term "a device for <u>detachably</u> connecting," which, although it is in the context of flexible electrical conductors, suggests that the term is not as limited as MDTech suggests.

On the other hand, Plaintiff contends that "connector" should be defined as "anything that connects," but ignores the language of the claim that requires the connector to both fixedly and releasably engage.  While some connectors are capable of being released, Plaintiff does not offer anything to support the contention that a person of ordinary skill in the art would have understood that *all* connectors are capable of being released.  The definition of "connect" includes the words "join, fasten, or link together" which imply both permanent and non-permanent connections (or connections that can be separated with and without loss or damage).  Given that the claim was drafted so that the connector could both fixedly and releasably engage, this term must be construed to reflect the language chosen by the drafter.

For the foregoing reasons, the Court first concludes that "second connector means" recites sufficient structure to perform the stated functions, thereby rebutting the means-plus-function

47

presumption.  In addition, however, the Court does not accept Plaintiff's proposed construction of "connector" as "anything that connects."  The claim describes a connector that is capable of being released after engaging, and the Court's construction must take into consideration this language chosen by the drafter.  In determining how to construe the limitation of being "releasably" engaged, the Court looks to the previous term because the patentee used the same term in the specification - "detachably" - in describing how the cannula mount connects to the spring guide as he did in describing how the stylet connects to the spring guide (or inner support rod, *see infra*, n. 13).  Because the specification describes the cannula mount as being "detachably affixed" to the spring guide, it appears the patentee wrote the claim term "releasably engaging" with a similar meaning in mind.  For the reasons stated in the previous term, the Court interprets the term "releasably" as requiring separation without loss or damage.

Accordingly, the Court construes this term to mean "<u>the biopsy actuator comprising a second connector, which is anything that can connect and be released without loss or damage, the second connector being capable of being releasably and fixedly engaged with the first connector.</u>"[18]

### 7.    "said proximal end having a first connector means secured thereto"

Like the preceding term, the dispute in interpreting this term concerns the phrase "first connector means."  Plaintiff's proposed construction for "first connector means" mirrors his proposed construction for "second connector means" - "anything that connects" - such that the entire term should be construed to mean, "said proximal end having a first connector, which is anything that connects, secured thereto."  In its claim construction brief, MDTech originally proposed the

---

[18]  Once again, the Court acknowledges that this construction of claim 2 may exclude coverage of the single use embodiment, but concludes that such a construction is not improper for that reason alone.

construction, "the proximal end of the cutting cannula includes a first means to connect."  At the *Markman* hearing, however, MDTech changed its proposed construction to defining this term as having a means-plus-function claim limitation under Section 112, ¶ 6.  (Tr. at 107.)  According to counsel for MDTech, the change occurred in order maintain consistency with MDTech's position that the phrase "second connector means" also constituted a means-plus-function claim and that the first connector means "would inevitably be that which communicates with the structure that is called for in the second connector means."  (*Id.*)  The structure MDTech identifies as correlating to the function of the "first connector means" is the cannula mount **58**, which contains a female quarter turn thread **74** that interacts with the male quarter turn thread on the spring guide (the second connector means, according to MDTech).

For the reasons stated in connection with preceding term, the Court does not find that this is a means-plus-function clause, but it also does not find that "first connector means" can be defined simply as "anything that connects" because the first connector necessarily interacts with the second connector, which must be capable of being released.  Therefore, the Court construes this disputed term as "<u>said proximal end having a first connector, which is anything that can connect and be released without loss or damage, secured thereto</u>."

## IV.    CONCLUSION

For the reasons articulated in this opinion, the Court construes the disputed terms of the patents-in-suit as follows:

For the disputed terms in **claim 7 of the '797 patent**:

| TERM | CONSTRUCTION |
|------|--------------|

49

| | |
|---|---|
| **a cannula mount affixing the cannula to the guide** | a structure or support which attaches or connects the cannula to the guide |
| **a manually operable charging member for moving the guide to the charged position against the urging of the coil spring** | a manually operable charging member that is used to create a charge or stored energy, the charging member configured to move the guide to the charged position against the urging of the coil spring |
| **a release means for retaining the guide in the charged position** | Means-plus-function claim in which the function is "retaining the guide in the charged position and releasing, or setting free, the guide from the charged position."  The structures corresponding to this function are: (1) for the reusable embodiment (Figs. 1 - 4A), the release lever **22**, including the latching projection **102**, the finger rest **96**, mounting section **98**, and connecting web **100**, as well as the equivalents thereof; and (2) for the single use embodiment (Figs. 5-8A), the release lever **222**, including the latching projection **302** and the mounting section **298**, as well as the equivalents thereof |

For the disputed terms in **claim 2 of the '798 patent:**

| TERM | CONSTRUCTION |
|---|---|
| **biopsy actuator** | a mechanism for putting the biopsy instrument in operating motion, other than by hand |
| **said stylet means being detachable from said cannula** | the stylet is capable of being separated or withdrawn from the cannula without loss or damage |

| said biopsy actuator comprising a second connector means for releasably and fixedly engaging the first connector means | the biopsy actuator comprising a second connector, which is anything that can connect and be released without loss or damage, the second connector being capable of being releasably and fixedly engaged with the first connector |
|---|---|
| said proximal end having a first connector means secured thereto | said proximal end having a first connector, which is anything that can connect and be released without loss or damage, secured thereto |

**IT IS SO ORDERED.**

**s/Kathleen M. O'Malley**
**KATHLEEN McDONALD O'MALLEY**
**UNITED STATES DISTRICT JUDGE**

**Dated: September 25, 2007**

51